14 A.3d 1193

**GEORGE WASSERMAN & JANICE WASSERMAN GOLDSTEN FAMILY LLC, et al.**

v.

**Jack KAY, et al.**

**No. 2836, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Feb. 9, 2011.

Reconsideration Denied April 6, 2011.

588

590

William Daniel Sullivan (Butzel, Long Tighe, Patton, PLLC, Washington, D.C., Brian E. Frosh, Karp, Frosh, Lapidus, Wigodsky & Norwind PA, Bethesda, MD, Warren K. Kaplan, Potomac, MD, on the brief), for appellant.

James H. Hulme (Joshua A. Fowkes, Arent Fox LLP, on the brief), Washington, D.C., for appellee.

Panel: EYLER, JAMES R., HOTTEN, J. FREDERICK SHARER (Retired, specially assigned), JJ.

EYLER, JAMES R., J.

Appellants, The George Wasserman and Janice Wasserman Goldsten Family Limited Liability Company ("WGF") and Anthony Tanzi, as Trustee of the Lisa W. Gill Trust ("Gill Trust"), are partners in five real estate investment general partnerships and members in two real estate investment LLCs (collectively, the "investment vehicles"). Appellees are Jack Kay ("Mr. Kay"), the managing member of one of the LLCs, and the *de facto* managing member or partner of the other investment vehicles; Kay Management Company, Inc. ("Kay Management"), an entity, owned and controlled entirely by Mr. Kay and of which Mr. Kay is president; and Kay Investment Group, LLC ("Kay Investment"), a separate investment entity managed and controlled solely by Mr. Kay.

On July 16, 2009, appellants filed a complaint (individually and on behalf of the investment vehicles) against appellees in the Circuit Court for Montgomery County. The complaint alleged principally that, beginning in 2003, Mr. Kay unilaterally and unlawfully took money from the investment vehicles and, mostly through Kay Management, invested the money with Kay Investment. Kay Investment, in turn, invested the money with Bernard Madoff entities. The money was lost when Madoff's infamous ponzi scheme collapsed in 2008. Ap-

pellants named the other partners and members of the investment vehicles as nominal defendants, for the sole purpose of bringing before the court all persons whose interests might be affected by the action.

Kay Management filed a motion to dismiss the claims brought against it on August 19, 2009. Kay Investment and Mr. Kay did the same on September 21, 2009. In each motion, appellees argued *inter alia* that, despite appellants' attempt to bring their claims individually and derivatively, all of appellants' claims are derivative. Appellees then argued that appellants' derivative claims fail because (1) a partner in a general partnership cannot, as a matter of law, file a derivative claim on behalf of the partnership; and (2) while derivative claims on behalf of an LLC are available, appellants failed to make demand on the two LLCs prior to filing their derivative claims, and no excuse for demand applied (*i.e.*, appellants failed to show that demand would have been futile).

The court ruled at a hearing on January 21, 2010 that, despite appellants' allegations, none of appellants' claims were individual, stating "I think they're all derivative." The court then determined that appellants' derivative claims were subject to dismissal. First, the court agreed with appellees that a partner may not bring a derivative claim on behalf of the partnership, reasoning that at least a majority of the partnership must agree to bring suit. Then, the court decided that appellants' failure to make demand before filing suit on behalf of the two LLCs was unexcused. The court reasoned that appellants had not demonstrated in sufficient detail that demand would have been futile. The court dismissed all of appellants' claims without leave to amend.

On January 27, 2010, after the court's oral ruling but before the court entered final judgment, appellants filed a motion for reconsideration of the court's dismissal and a proposed amended complaint. That same day, appellees filed a motion to strike the amended complaint. Two days later, on January 29, 2010, appellants filed a motion for leave to file the amended complaint. On February 4, 2010, the trial court issued an

order striking the amended complaint and denying appellants' motion for reconsideration, and another order denying appellants' leave to file an amended complaint.

On February 4, 2010, the court filed an order and final judgment of dismissal that (1) dismissed all of appellants' alleged direct claims with prejudice; (2) dismissed appellants' claims on behalf of the five general partnerships "without prejudice for failure to have obtained unanimous consent [of] all general partners of each of the said general partnerships other than Jack Kay but without prejudice to suit with such unanimous consent;" and (3) dismissed appellants' derivative claims on behalf of the two LLCs without prejudice for having failed to submit demand.

Appellants timely appealed to this Court. On June 30, 2010, appellants submitted their brief to this Court, and on September 13, 2010, appellees submitted their brief. On October 12, 2010, appellants filed a reply brief, which contained a provision from one of the investment vehicles' operating agreements. On November 12, 2010, appellees moved to strike that provision from appellants' reply brief, arguing that the provision appears nowhere in the record, and was, in any case, mischaracterized by appellants. Alternatively, appellees requested this Court to take judicial notice of two of the investment vehicles' operating agreements, which were attached to the motion as exhibits. On November 23, 2010, appellants responded to appellees' motion to strike, conceding that they "do not object to either remedy," but arguing that appellees, rather than appellants, misconstrued the provision. Appellees filed a reply to appellants' response on December 3, 2010, arguing, among other things, that appellants' interpretation of the provision is incorrect.

The parties agree, as do we, that we should review the legal sufficiency of the proposed amended complaint. For the reasons that follow, we shall reverse the order granting the motion to dismiss with prejudice, grant in part and deny in part the orders denying appellants' motion for leave to amend and granting appellees' motion to strike the amended com-

plaint, and grant leave to file an amended complaint consistent with this opinion. We shall deny appellees' motion to strike certain portions of appellants' reply brief but effectively grant the relief requested in that we shall not consider the challenged portions.

## Factual Background

### 1. The Investment Vehicles and the Kay Parties

The Kay family founded the seven investment vehicles, which were all originally general partnerships, without written partnership agreements. George Wasserman, a Kay family friend, was admitted as an original partner. Appellants are successors to George Wasserman.

The investment vehicles, in their current forms, are comprised of two LLCs and five general partnerships. They are as follows:

A. Kaywood Garden Apartments, LLC, a Maryland limited liability company ("Kaywood")

B. Indian Spring Country Club, LLC, a Maryland limited liability company ("Indian Spring")

C. Village Square–Wheaton, a Maryland general partnership ("VS–Wheaton")

D. Village Square North, a Maryland general partnership ("VS–North")

E. Barcroft View Apartments, a Virginia general partnership ("Barcroft")

F. K.G.W. Associates, a Maryland general partnership ("KGW")

G. Kay Construction Company, a Maryland general partnership ("Kay Construction")

Appellants' respective interests in the investment vehicles are as follows: (1) WGF is a member in Kaywood (32% owner) and Indian Spring (30% owner), and is a general partner in VS–Wheaton (30% owner), VS–North (25% owner), Barcroft (30% owner), and KGW (10% owner); (2) Gill Trust is a

general partner in VS–Wheaton (30% owner), KGW (12.5% owner) and Kay Construction (30% owner).

Appellees' roles in the case are as follows: (1) Mr. Kay was the *de facto* (or, in the case of Kaywood, actual) managing member or partner of each of the investment vehicles because of his expertise in real estate acquisition, ownership, development .and management; (2) Kay Management managed the funds of five of the seven investment vehicles (Kaywood, VS–Wheaton, VS–North, Barcroft and KGW) at all times material to this litigation, and managed the funds of Indian Spring starting in 2006;[1] and (3) Kay Investment, as noted above, is a separate investment entity managed and controlled solely by Mr. Kay.[2]

## 2. The Original Complaint

Appellants' original complaint first set forth reasons why demand against the investment vehicles would have been unlikely to succeed. Demand upon Kaywood, appellants claim, would not have been likely to succeed because Mr. Kay is the managing member of Kaywood and because he, his family and affiliates own a majority of the interests in Kaywood. Similarly, demand upon Indian Spring to bring the action was unlikely to succeed because Mr. Kay and his family and affiliates own a majority of the interests in the company. Further, appellants continued, demand upon the five general partnerships to bring the suit would not have been likely to succeed and would be futile because the majority of the partners in those partnerships are Mr. Kay, his family and affiliates. Appellants designated themselves the only appropriate persons to represent the interests of the investment vehicles in this action because "they are aggrieved, they are

---

1. Funds of the remaining investment vehicle, Kay Construction, were managed by Mr. Kay himself. According to the complaint, Mr. Kay managed Kay Construction for a fee, and his role of manager was independent of his role as partner in Kay Construction.

2. Although the other partners/members were named as "nominal defendants" in the original complaint, they were not included in the amended complaint, and are not the subject of any issue on appeal.

not conflicted in the matters upon which suit is brought, and there is no other person authorized, willing and able to bring this action."

The complaint then described the way in which the investment vehicles' funds were to be managed according to (1) the operating agreements of the two LLCs; (2) the written agreements and/or custom of the general partnerships; and (3) the management agreements between the investment vehicles and Kay Management. According to appellants, the operating agreements of the two LLCs contained explicit requirements for company funds to be kept in a bank account or a savings and loan account and to be either distributed to the members, or continued to be held as reserve funds. As for the five general partnerships, appellants allege that each "either has a written provision for the safe-keeping and distribution or reserve of partnership funds substantially identical to those of the two LLCs or had, by 2003, at least 40 years of consistent practice of so holding partnership funds." Last, appellants alleged that the management agreements with Kay Management required that all funds coming under the control of Kay Management be either distributed to the partners/members or, if required for reserves, be

> deposited in an interest-bearing bank account or in a certificate of deposit in a federally insured bank or savings and loan or in securities issued and fully guaranteed by the United States Government or bank repurchase agreement secured by United States Government obligations.

The complaint then alleged that Mr. Kay, rather than distributing the money at issue to the investors or holding it as reserve funds, unlawfully transferred the money to Kay Investment, and then caused Kay Investment to funnel them to the Madoff operation. According to appellants, Mr. Kay did this by making each of the investment vehicles members of Kay Investment, and "caus[ing] all or substantially all of the reserve funds of the investment vehicles to be transferred to [Kay Investment]." With respect to those funds controlled by Kay Management, Mr. Kay "caused, induced, or conspired with Kay Management to relinquish control of those funds."

Appellants claimed that Mr. Kay did this without notifying any other members or partners, and that none of the investment vehicles had consented to investing the funds other than in bank or savings and loan deposits or U.S. Government-backed bonds. The complaint stated further that, "[o]nce funds of the investment vehicles arrived at Kay Investment, they were commingled with similar funds from numerous other real estate projects managed by Kay Management or in which [Mr.] Kay had an interest, packaged into a single account, and sent by wire transfer" to Madoff. The complaint alleged further that making the investment vehicles members of Kay Investments "not only gave [Mr.] Kay control of greater and greater funds to invest with Madoff but provided a bonus to [Mr.] Kay in the form of an additional management fee or 'administrative fee' charged by Kay Management of 4.5% to 5% of the fictitious 'profits' reported by Madoff to have been earned by the [Kay Investment] account." Appellants estimated that Kay Management received upwards of $800,000 annually in such fees.

Appellants then alleged that in January 2009, Mr. Kay sent appellants letters informing them that the funds of their investment vehicles had been invested with Madoff and lost, and that appellants' individual shares of the loss exceeded $3.8 million. After sending the letter, Kay Investment admitted to appellants that the losses of six of the investment vehicles, net of the fictitious investment returns by Madoff, were as follows:

a. Kaywood: $4,730,000.00
b. Indian Spring: $1,031,313.40
c. Barcroft: $810,000.00
d. KGW: $2,216,000.00
e. VS–Wheaton: $740,000.00
f. VS–North: $649,000.00

The loss to Kay Construction, according to the complaint, was approximately $700,000.00.

Next, appellants claimed that, following the collapse of Madoff, Kay Management credited the accounts of the invest-

ment vehicles with the management or "administrative" fees charged during 2008 on the fictitious Madoff income, but it failed to reimburse the investment vehicles for fees charged during the six prior years.

Further, appellants alleged that appellees' actions caused the investment vehicles to suffer damage including (1) the loss of their reserve funds; (2) the loss of the interest that would have been earned on such funds; and (3) the fees charged by Kay Management based upon the fictitious profits reported by Madoff. Appellants, they claim, "have suffered their proportionate share of such losses."

The complaint then set forth thirteen counts. Count I was against Mr. Kay, Kay Investment, and Kay Management for fraud. Among other things, appellants contended that Mr. Kay knew and deliberately did not inform the members and partners of each investment vehicle that: (1) he was investing the reserve funds in investments other than bank or savings and loan deposit accounts, or U.S. Government-backed securities, in express and deliberate violation of the agreements governing the vehicles; (2) he had created Kay Investment for the sole purpose of investing the reserve funds of the investment vehicles with Madoff; (3) he had failed to exercise due diligence in investing with Madoff; (4) Madoff was purporting to act not as a broker, but as a discretionary manager and investment advisor with regard to the investment vehicles' funds; (5) Madoff was secretive about his investing methods; (6) Madoff demanded that Mr. Kay and Kay Investment not inform the members and partners of the investment vehicles that Madoff was managing their money; (7) Kay Investment had transferred large amounts of money to Madoff's personal account rather than to Bernard Madoff Securities; (8) he had, on a form supplied by Madoff, objected to disclosing Kay Investment's identity to issuers of the securities that Madoff purported to purchase; and finally (9) he knew that Madoff would be subjecting the funds to "highly speculative" investments. Appellants alleged that Mr. Kay deliberately did not inform the members and partners of those facts because he

did not want them to question his decision to invest the reserve funds of the investment vehicles with Madoff.

Next, appellants claimed that Kay Investment

actively aided and abetted Kay ... by commingling the fiduciary funds of the investment vehicles with the funds of others, by sending the commingled funds off to Madoff in violation of the ... agreements regarding such investments, by failing to conduct any due diligence regarding Madoff, by failing to adequately monitor the integrity of the monthly statements received from Madoff to detect irregularities, by providing false and misleading information for inclusion in the annual financial statements, ... and by refusing, presumably at Madoff's direction, to disclose the identity of the other entities with whom the funds of the investment vehicles were commingled.

Appellants similarly alleged that Kay Management aided and abetted Mr. Kay's fraud

by transferring the reserve funds of the investment vehicles (other than Indian Spring and [Kay] Construction) to [Kay Investment] with the knowledge and intent that such funds be commingled and invested with Madoff and with knowledge that the conduct of Kay Management was in breach of the agreements between Kay Management and the said investment vehicles.

Count II was against Mr. Kay, Kay Investment and Kay Management for breach of fiduciary duties, in which monetary damages were sought. The complaint stated that Mr. Kay was a fiduciary to each of the investment vehicles and to the individual partners and members. Appellants claimed that Mr. Kay breached his fiduciary duties by (1) unilaterally depositing the reserve funds in violation of the investment vehicles' agreements, and failing to disclose that fact to the other partners/members; (2) making each investment vehicle a member of Kay Investment for the sole purpose of investing with Madoff, and then commingling the reserve funds in Kay Investment with money from other investors, without consulting the other partners/members beforehand or informing them

after the fact; (3) investing with Madoff without any due diligence; (4) failing to tell the other partners/members that Madoff was purporting to act not as a broker but as a manager and investment advisor; (5) failing to tell the other partners/members that Madoff was secretive about his investing methods, that Madoff had asked Mr. Kay and Kay Investment not to disclose that he was managing the funds, that Kay Investment had transferred money to Madoff's personal account, and that Mr. Kay had refused to disclose Kay Investment's identity to the issuers of Madoff's purported securities; (6) allowing Kay Management to take a fee of 4.5% to 5% on the fictitious profits reported by Madoff, and failing to tell the other partners/members about the fee; (7) refusing to supply appellants with the facts relating to the losses of the investment vehicles after the losses were incurred, refusing to answer appellants' questions relating to the Madoff investments and who the other members of Kay Investment are; and (8) telling appellants and the other investors, "falsely, that attorneys were being engaged to 'diligently pursue all legal and equitable remedies which may be available' when, in fact, such attorneys were engaged only to pursue the bankrupt Madoff and protect [Mr. Kay] from liability."

Appellants then claimed that Kay Investment and Kay Management aided and abetted Mr. Kay's breach of fiduciary duty by engaging in the same acts that they allegedly committed in aiding and abetting Mr. Kay's fraud, described above.

Count III was against Mr. Kay, Kay Investment and Kay Management for conversion. Essentially, appellants alleged that Mr. Kay converted the funds of each of the investment vehicles "to advance his own goals and to enrich Kay Management." Again, appellants claimed that Kay Investment and Kay Management aided and abetted Mr. Kay in his conversion of funds by the same means described in the fraud and breach of fiduciary duty counts.

Count IV was against Kay Management alone and directly for conversion. Appellants stated that Kay Management was a fiduciary of Kaywood, Barcroft, VS–Wheaton, VS–North,

and KGW at all times relevant to the litigation, and a fiduciary of Indian Spring since 2006. Kay Management, appellants alleged, breached its trust to those entities by causing their funds to be placed in Kay Investment.

In Count V, appellants claimed that Mr. Kay alone engaged in tortious interference with the contractual relationship between Kay Management and the investment vehicles whose funds it managed by inducing Kay Management to breach its contracts with each investment vehicle.

Count VI was against Mr. Kay alone for breach of the investment vehicles' partnership agreements and operating agreements. Essentially, appellants alleged that investment of the reserve funds with Madoff was contrary to the agreements governing the investment vehicles, the alleged provisions of which are detailed above.

Count VII, also against Mr. Kay alone, was for breach of the Kay Investment operating agreement. Among other things, appellants alleged that (1) Mr. Kay, as sole managing member of Kay Investment, was a fiduciary to each of the investment vehicles; (2) in that fiduciary capacity, Mr. Kay was required to exercise reasonable business judgment in investing Kay Investment's funds; and (3) Mr. Kay breached his duties to the investment vehicles by failing to use reasonable business judgment.

In Count VIII, appellants claimed that Kay Management breached its management agreements with Kaywood, Barcroft, VS–Wheaton, VS–North, KGW and Indian Spring by "transferring the funds to Kay Investment and charging an additional fee on the fictitious earnings from the reserve funds, notwithstanding the prohibition on any such charge in the agreements." Again, the provisions of those allegedly breached agreements are detailed above.

In Count IX, appellants claimed that Mr. Kay, Kay Investment, and Kay Management alike engaged in civil conspiracy "to convert monies rightfully belonging to the investment vehicles and [appellants] by transferring the funds of each of Kaywood, Barcroft, VS–Wheaton, VS–North, and (from and

after 2006) Indian Spring to [Kay Investment] and from [Kay Investment] to Madoff."

Count X was against all three appellees for Statutory Conspiracy with respect to Barcroft alone. Appellants alleged that, pursuant to Va.Code § 18.1–500,[3] appellees are subject to treble damages for Barcroft's losses.

In Count XI, appellants claimed that all three appellees were negligent, grossly negligent, and engaged in reckless misconduct. They argued that appellees, as managers of the funds, "had a duty to invest the reserve funds in accordance with existing agreements pertaining thereto, and to exercise reasonable skill and care in so doing." Then, appellants essentially incorporated by reference appellees' actions alleged above, stating that "[b]y each of the said actions recited above, each of [Mr.] Kay, [Kay Investment] and Kay Management was negligent, grossly negligent and reckless in its conduct of its affairs on behalf of the investment vehicles and [appellants]."

Count XII, against Kay Management alone, was to reform Kay Management's contracts with the investment vehicles so that the agreements are terminable at will or on the sale of any of the properties owned by the investment vehicles, and so that no "administrative fee" be payable to Kay Management upon interest or other income generated by the investment vehicle's reserve funds. Count XII also requested that Kay Management restore to the investment vehicles all fees taken by Kay Management upon the fictitious Madoff income.

The last count, Count XIII, was against Kay Management alone for unjust enrichment. In that count, appellants requested that Kay Management disgorge all of the management fees it received on the earnings of the reserve funds for the years 2003–2008.

Appellants then requested relief "individually and on behalf of the investment vehicles" in the form of compensatory damages against each of the appellees, jointly and severally.

---

**3.** Repealed.

Specifically, appellants requested: $4,730,000.00 on behalf of Kaywood; $1,031,313.40 on behalf of Indian Spring, $810,000.00 on behalf of Barcroft, $2,216,000.00 on behalf of KGW; $740,000.00 on behalf of VS–Wheaton; $649,000.00 on behalf of VS–North; and $700,000.00 on behalf of Kay Construction. Appellees also requested on behalf of each investment entity that appellees pay the interest that would have accrued on the reserve funds had they not been invested in Madoff, the return of all fees charged by Kay Management, plus punitive damages in the amount of $5 million or such other amount as the jury may find.

Alternatively to those requests on behalf of the entities, appellants prayed for an award in the amounts stated above "multiplied by their percentages interests."

Appellants also requested an award of attorneys' fees, costs and expenses. Last, appellants elected a jury trial.

### 3. The Amended Complaint

In their amended complaint, appellants essentially augmented two aspects of their original complaint: (1) the reasons why demand upon the various investment vehicles would be unlikely to succeed; and (2) the nature of appellants' alleged individual losses. Appellants also dropped Count XII of the original complaint.[4]

With respect to the question of demand, appellants added that demand upon Kaywood would not likely have been successful because the operating agreement of Kaywood requires at least 70% of the interests in Kaywood in order to override Mr. Kay's decisions, and because Mr. Kay, his family and affiliates own more than 30% of the interests in Kaywood. Next, appellants pointed to a new exhibit A, a chart of the

---

**4.** Thus, in the amended complaint, appellants' claim against Kay Management for unjust enrichment, which was Count XIII in the original complaint, takes the place of the deleted count as Count XII. For the sake of clarity, we note that any further discussion of Count XII refers to Count XII of the *amended* complaint.

investors' relations to Mr. Kay. Appellants described the chart as follows:

a. The first five partners and members on Exhibit A are defendant Kay (individually or as trustee) and his daughter (individually or as trustee or representative). There is no division between defendant Kay and his daughter.

b. The next seven partners and members on Exhibit A are defendant Kay's sister (Silvia K. Greenberg) and her immediate family, known herein as the Greenberg Family Members. The Greenberg Family Members, after investigation of the facts and with representation of independent counsel, have taken the position that they will neither agree to nor disagree with the bringing of this suit on behalf of the investment vehicles.

c. The next ten partners and members on Exhibit A are all members of the Grossberg/Fox family. Louis C. Grossberg was the founder of Grossberg Co. LLP, an accountancy firm founded in 1924 that has acted as the accountants for defendant Kay and for defendant Kay's father before him for approximately six decades. The daughter of Louis and Celia K. Grossberg, Perla G. Fox, is married to Julius I. Fox, an attorney who represented defendant Kay for approximately five decades and whose firm (Grossberg, Yochelson, Fox & Beyda, LLP), founded in 1930, have represented both defendant Kay and Kay's father for approximately seven decades and continues to represent defendant Kay. Julius I. Fox has represented to counsel for [appellants] that, as a member of the bar of Maryland, he represents all of the said ten partners and members and that neither he (in his capacity as controlling member of Octagon Fox, LLC, Parallel Fox, LLC and Polygon Fox, LLC) nor any of the other said partners or members (being his sons and his wife) would consent to a suit against defendant Kay because of the family's long association with the family of defendant Kay and because he did, and his firm continues to, represent defendant Kay.

With regard to appellants' individual losses, appellants added that Mr. Kay caused *not only the reserve funds* to be

transferred to Kay Investment-he also caused "substantial portions of the *funds required to be distributed* to partners and members of the investment vehicles to be transferred to [Kay Investment]." (emphasis added). Appellants described their individual losses as follows:

a. First, in the case of each of the investment vehicles, [appellants] incurred the diminution of the value of their interests in the investment vehicles.

b. Second, [appellants] incurred the loss of distributions required to have been made to them under the agreements governing the operation of the investment vehicles. Thus, in the case of Indian Spring and Kay Construction, all of the funds lost were funds that were required to have been distributed to [appellants] and the other members and partners of those investment vehicles. In the case of the remaining investment vehicles, some of the funds lost were funds that were required to have been distributed to [appellants] and the other members and partners of those investment vehicles, and some of the funds lost were required to have been held in reserve. Each of those said remaining investment vehicles is operating and producing net cash flow and each of them is likely to continue to be reduced or eliminated until the investment vehicles have made up for the losses of such reserves.

Appellants also augmented their request for relief to reflect those individual losses. In the original complaint, appellants had requested that, in the alternative to compensatory damage awards in the amounts owed to each investment vehicle, the court award them those amounts "multiplied by their percentages interests...." In the amended complaint, appellants requested more specifically (and again in the alternative to awards on behalf of each investment vehicle, which were the same as those prayed for in the original complaint) that (1) WGF receive "the sum of not less than $2,671,844, plus the earnings thereon such [appellant] would have been able to obtain, from the times it was deprived of the distribution of the funds to which it was entitled, together with punitive damages in such amount as the jury may find;" (2) that Gill

Trust receive "the sum of not less than $709,000, plus the earnings thereon such [appellant] would have been able to obtain, from the times it was deprived of the distribution of the funds to which it was entitled, together with punitive damages in such amount as the jury may find;" and (3) that the court award appellants their reasonable attorneys fees along with the costs and expenses of litigation.

## Standard of Review

▬▬▬ We review the grant of a motion to dismiss as a question of law. *Reichs Ford Rd. Joint Venture v. State Rds. Comm'n of the State Hwy. Admin.,* 388 Md. 500, 509, 880 A.2d 307 (2005). In considering the dismissal, we must inquire whether the well-pleaded allegations of fact contained in the amended complaint reveal any set of facts that would support the claim made. *See Pittway Corp. v. Collins,* 409 Md. 218, 238–39, 973 A.2d 771 (2009). In so doing, we must assume the truth of all well-pleaded relevant and material facts as well as all inferences that reasonably can be drawn therefrom. *Alleco Inc. v. Harry & Jeanette Weinberg Found.,* 340 Md. 176, 180, 665 A.2d 1038 (1995). We may order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.,* the allegations do not state a cause of action. *Shenker v. Laureate Educ., Inc.,* 411 Md. 317, 335, 983 A.2d 408 (2009).

## Discussion

The principal issues on appeal, as we see them,[5] are two-fold: (1) whether appellants may bring individual claims di-

---

5. The issues, as framed by appellants, were originally as follows:

1. Whether the circuit court abused its discretion in denying [appellants'] motion to amend their complaint where appellants had argued, both in their briefs and at oral argument on the motions to dismiss, the facts they sought to incorporate in their proposed amended complaint.

2. Whether partners in general partnerships and members of LLCs may, on their own behalf, sue another partner and member who, in violation of the contractual, statutory and common law duties of one partner or member to another, has misappropriated funds held in

rectly against Mr. Kay (*i.e.*, whether claims against Mr. Kay are individual, rather than purely derivative, in nature); and (2) whether appellants may bring derivative claims (on behalf of the partnerships and the LLCs) against Mr. Kay. Before approaching those issues, however, we find it necessary to engage in a background discussion on corporations, general partnerships and LLCs, and to summarize the parties' contentions. At the close of our discussion of the issues, we shall apply our legal conclusions to the alleged facts in order to determine which counts are legally viable. For ease of analysis, we shall only address the merits of appellants' claims against Kay Management and Kay Investment in the application portion of our discussion.

*1. Background: Maryland Corporations, General Partnerships and LLCs*

 *A. Corporations*

 Generally, a board of directors manages the business and affairs of a corporation. Maryland Code (2007 Repl.Vol., 2010 Cum.Supp.), § 2–405.1(a) of the Corporations and Associ-

---

fiduciary accounts for distribution to the partners and members (or for reserves, the replenishment of which out of earnings necessarily diminishes subsequent distributions).

3. Whether partners of a general partnership may, on behalf of the partnership, sue a partner who has unlawfully taken partnership funds without first obtaining the unanimous consent of the other partners where the other partners, although joined in the action, voiced no disagreement with the action and were, in any event, so conflicted in their loyalties to the wrongdoing partner that they would not do so.

4. Whether members of a limited liability company may, on behalf of the limited liability company, sue a member who has unlawfully taken LLC funds without first making demand on the other members of the LLC where the other members have either stipulated that they took no position on whether [appellants] should or should not sue on behalf of the limited liability companies or have stated clearly that they would not, for reasons of professional connections to the defendant, consent to such a suit.

5. Whether [appellants] were, either with or without an answer to the foregoing, entitled to sue Kay Management and [Kay Investment].

For practical reasons, we have condensed appellants' five issues into two principal issues.

ations Article ("C.A."); *Werbowsky v. Collomb,* 362 Md. 581, 598–99, 766 A.2d 123 (2001). Unless a transaction or decision must, by law or under the corporate charter, be approved by the shareholders, the directors exercise the powers of the corporation-either directly or by virtue of the officers they appoint. *See* C.A. § 2–405.1(b); *Werbowsky,* 362 Md. at 599, 766 A.2d 123. Ordinarily, shareholders are not permitted to interfere in the management of the company. *Werbowsky,* 362 Md. at 599, 766 A.2d 123. This is because they are the owners of the company, but not its managers. *Id.* Thus, "any exercise of the corporate power to institute litigation and the control of any litigation to which the corporation becomes a party rests with the directors or, by delegation, the officers they appoint." *Id.*

As a check on this broad managerial authority, directors' actions are subject to fiduciary duties. *Id.* Originally, corporate directors, with respect to management of the corporation, owed fiduciary duties of care and loyalty to both the corporation and the shareholders. *See, e.g., Booth v. Robinson,* 55 Md. 419, 436–37 (1881) (holding that directors "occupy a fiduciary relation to the corporation and its stockholders"). Over time, however, the law became that, generally, directors owed corporate management duties to the *corporation* alone— not the shareholders. *Werbowsky,* 362 Md. at 599, 766 A.2d 123 (stating that the directors' duties "[r]un[ ] ... to the corporation and not, at least directly, to the shareholders"). The standard of care owed by directors to the corporation is currently codified at C.A. § 2–405.1, which requires directors to perform their duties (1) "[i]n good faith;" (2) "[i]n a manner [they] reasonably believe[ ] to be in the corporation's best interests;" and (3) "[w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances." C.A. § 2–405.1(a). The statute effectively constitutes a limitation on liability to the corporation that would otherwise exist under common law.

Because directors' fiduciary duties relating to management do not extend to shareholders, a minority shareholder

generally does not have a direct action for breach of those duties against the directors, except in cases affecting fundamental shareholder rights (*e.g.*, a shareholder's right to require the corporation to buy its stock, known as an appraisal right). As a result, the shareholder's derivative action developed at common law "in the mid–19th Century as an extraordinary equitable device to enable shareholders to enforce a corporate right that the corporation failed to assert on its own behalf." *Werbowsky,* 362 Md. at 599, 766 A.2d 123.

▮ A corporate derivative action is essentially a suit by the shareholders to compel the corporation to sue and, simultaneously, a suit by the corporation, asserted by the shareholder on its behalf, against a defendant or defendants. *Id.* (citing William Meade Fletcher et al., Encyclopedia of the Law of Private Corporations § 5941.10 (1995 Rev. Vol.)). This type of suit is derivative because the plaintiff "derives" its right to sue from the ability of the entity whose rights the plaintiff is asserting. Usually, the proceeding is only necessary for minority shareholders, since a majority or controlling shareholder can typically persuade the corporation to sue in its own name. *Werbowsky,* 362 Md. at 599, 766 A.2d 123.

▮ An action for damages for injuries to a corporation must be brought derivatively in the name of the corporation. *Waller v. Waller,* 187 Md. 185, 189, 49 A.2d 449 (1946). In other words, "[i]f the wrong alleged was committed against the corporation, then the stockholder may not sue individually but only derivatively." James J. Hanks, Jr., *Maryland Corporation Law* § 78.21(b) (Supp.2010) [hereinafter "Hanks"]. Conversely, "[i]f the wrong alleged was committed against the stockholder rather than the corporation, then the stockholder must bring the action as a direct action—either individually or as a representative of a class—and not as a derivative action." *Bender v. Schwartz,* 172 Md.App. 648, 665–66, 917 A.2d 142 (2007) (citations omitted).

Reasons for derivative actions include: (1) the prevention of several lawsuits by shareholders against the same defendants; (2) protection of corporate creditors by putting assets back

into the corporation; and (3) protection of all shareholder interests by increasing the value of their shares. At the same time, derivative suits adequately compensate claimant shareholders by increasing the value of their shares.

■ In part because a derivative action intrudes on directors' managerial prerogatives, the law limits shareholders' ability to bring such actions. Before filing suit on behalf of the corporation, shareholders must first make a good faith effort to have the corporation act directly. *Id.* This effort is known as making "demand" upon the corporation. Once demand is made, the board of directors must conduct an investigation into the allegations in the demand, and decide whether litigation would be in the corporation's best interests. *Bender,* 172 Md.App. at 666, 917 A.2d 142. The board can appoint a committee of disinterested directors to undertake this investigation. *Id.* If the corporation fails to bring suit, the shareholders may then bring a "demand refused" action. *Id.* The plaintiff can still allege that the board, in fact, did not act independently, or that the board's refusal to bring suit was wrong. *Id.* To determine whether the board wrongly refused to bring suit, courts review the board's investigation under the strict business judgment rule. *Id.* Under that rule, courts defer to the board or committee's decision not to bring suit "unless the stockholders can show either that the board or committee's investigation or decision was not conducted independently and in good faith, or that it was not within the realm of sound business judgment." *Id.*

■ Shareholders can avoid the demand requirement only if demand is excused as "futile." *Id.* The futility exception is viewed as a

very limited exception, to be applied only when the allegations or evidence clearly demonstrate, in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond

to a demand in good faith and within the ambit of the business judgment rule.

*Werbowsky,* 362 Md. at 620, 766 A.2d 123. In the corporate context, the question of whether a particular claim is direct or derivative has produced considerable litigation.

### B. General Partnerships

Maryland's Revised Uniform Partnership Act ("RUPA"), C.A. §§ 9A–101 to 9A–1205,[6] governs Maryland general partnerships and limited liability partnerships. Before the RUPA, those entities were governed by the Uniform Partnership Act ("UPA"), which was enacted in 1916. *Shafer Bros. v. Kite,* 43 Md.App. 601, 607, 406 A.2d 673 (1979). The RUPA, enacted in 1997 and effective in 1998, was phased into Maryland law to completely replace the UPA by January 2003.

The RUPA defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit. . . ." C.A. § 9A–101(i). Each partner is an agent of the partnership. C.A. § 9A–301. Under certain circumstances, partners' actions bind the partnership. *Id.*

Section 9A–401 establishes partners' rights and duties. Of particular relevance here are subsections (f), (g) and (j). Subsection (f) sets forth partners' management rights, stating, "[e]ach partner has equal rights in the management and conduct of the partnership business." C.A. § 9A–401(f). Subsection (g), in turn, provides that partners have a right to possess partnership property for partnership purposes. C.A. § 9A–401(f) ("A partner may use or possess partnership property only on behalf of the partnership."). Subsection (j) establishes the various types of consent required to resolve partnership differences. It provides that

[a] difference arising as to a matter in the ordinary course of business of a partnership may be decided by a majority of the partners. An act outside the ordinary course of busi-

---

**6.** To avoid confusion, we note that any citations to the RUPA's Official Comments refer to comments to the model act drafted by the Uniform Law Commissioners—not the Act adopted in Maryland.

ness of a partnership and an amendment to the partnership agreement may be undertaken only with the consent of all the partners.

Section 9A–403 concerns partners' rights and duties with respect to information. Subsection (c) states that "[e]ach partner and the partnership shall furnish to a partner, ... [w]ithout demand, any information concerning the partnership's business and affairs reasonably required for the proper exercise of the partner's rights and duties under the partnership agreement or this title...." C.A. § 9A–403(c).

Under common law, general partners owe each other and the partnership fiduciary duties. *Herring v. Offutt,* 266 Md. 593, 597, 295 A.2d 876 (1972) ("The partnership relationship is of a fiduciary character which carries with it the requirement of utmost good faith and loyalty and the obligation of each member of the partnership to make full disclosure of all known information that is significant and material to the affairs or property of the partnership."). Those duties have been modified and codified in § 9A–403 of the RUPA, which states that "[t]he only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care...." C.A. § 9A–403(a). Subsection (b) details partners' duty of loyalty. It provides, in relevant part, that partners must not "deal[ ] with the partnership ... as or on behalf of a party having an interest adverse to the partnership." C.A. § 9A–403(b). Subsection (c), in turn, addresses duties of care. It prohibits partners "from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law." C.A. § 9A–403(c). The nature and extent of these duties may be altered by the terms of a partnership agreement.[7] *See* C.A. § 9A–103 (permitting partnership agreements to vary the statutory provisions except for nonwaivable items).

---

7. The allegations before us indicate that there are no partnership agreement provisions limiting a duty that would otherwise exist.

With respect to litigation, RUPA § 9A–405 provides in relevant part:

(a) *Action against partner.*—A partnership may maintain an action against a partner for a breach of the partnership agreement, or for the violation of a duty to the partnership, causing harm to the partnership.

(b) *Action against partnership.*—A partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to:

(1) Enforce the partner's rights under the partnership agreement;

(2) Enforce the partner's rights under this title, including:

(i) The partner's rights under § 9A–401, § 9A–403, or § 9A–404

. . . .

It is clear under § 9A–405(b) that a general partner can sue the partnership or another general partner directly on an *individual* claim. In that scenario, the partner sues at his or her own expense, is free of potential partnership limits on authority to sue (such as § 9A–401(j), discussed below), is entitled to any recovery, and need not join the partnership as an indispensable party. Alan R. Bromberg and Larry E. Ribstein, *Bromberg & Ribstein on Partnership*, § 5.04(d) (Supp.2010) [hereinafter "Bromberg and Ribstein"].

In analyzing a partner's direct suit on an individual claim, it is necessary to determine whether the suit must first proceed as an accounting action. Historically, under the UPA, an action in the form of an accounting was at least favored, if not required. In contrast to the UPA, the RUPA, in § 9A–405(b), expressly recognizes the availability of an action other than and prior to an equitable accounting action. *See* C.A. § 9A–405(b) (providing that "[a] partner may maintain an action against the partnership or another partner *for legal or equitable relief, with or without an accounting* " to enforce the partnership agreement or other rights) (emphasis added).

However, while § 9A–405(b) *authorizes* both legal and equitable actions, with or without an accounting, it does not *mandate* any particular form of action. Thus, the appropriate form of action depends on the facts in any given partnership dispute, and must be assessed on a case-by-case basis. Such an assessment may consider the historical exceptions to the accounting rule, which were recognized long prior to the broad authorization contained in the RUPA. We consider those exceptions below in the context of this case.

The law surrounding *derivative* suits within partnerships, as opposed to direct, individual suits, is unsettled. Nothing in the RUPA explicitly permits a general partner to bring a *partnership* claim on behalf of the partnership-as opposed to an individual claim on behalf of the individual partner. Nor does the RUPA explicitly prohibit such a claim. This lack of statutory direction, in combination with a dearth of case law expounding on the RUPA (specifically, § 9A–405), has left open the questions concerning derivative partnership suits that have been raised in this case. We shall discuss those questions below.

## C. Limited Liability Companies

An LLC is an unincorporated business organization. C.A. § 4A–101(*l*). The LLC statutes vary from state to state. Some states' LLC codes tend to be more akin to corporate codes, and other states' codes are more akin to the RUPA. James R. Burkhard, *Partnership and LLC Litigation Manual: Actions for Accounting and Other Remedies* § 5.01 (1995) [hereinafter "Burkhard"]. The LLC is essentially a cross between a corporation (for limited liability purposes) and a partnership (for tax purposes). *Id.* The individuals comprising an LLC are referred to as "members." C.A. § 4A–101(n). The agreement of the members concerning the affairs of an LLC and the conduct of its business is called an "operating agreement," which is much like a partnership agreement. The operating agreement may determine how the LLC is managed. C.A. § 4A–402(a). Unless otherwise agreed, deci-

sions concerning the LLC's affairs require the members' majority consent. C.A. § 4A–403(2).

Unlike the corporate and general partnership context, there is no statute in Maryland expressly addressing LLC members' fiduciary duties. Nevertheless, managing members of LLCs owe common law fiduciary duties to the LLC and to the other members. Managing members are clearly *agents* for the LLC and each of the members, which is a fiduciary position under common law. *Insurance Co. of North America v. Miller,* 362 Md. 361, 765 A.2d 587 (2001) ("Agency is the fiduciary relation which results from the manifestation of consent by one person [the principal] to another [the agent] that the other shall act on his behalf and subject to his control and consent by the other so to act") (quotations and citations omitted). In the partnership and corporate context, fiduciary duties are not born of statutory language-the underlying fiduciary duties pre-exist the statutes, and those duties exist as such unless limited by statute. *See generally Shenker,* 411 Md. at 328–29, 983 A.2d 408 (holding that, in a cash-out merger situation, common law directorial duties to individual shareholders were not precluded by C.A. § 2–405, the statute governing, and, in some respects, limiting, directorial duties). The same holds true in the LLC context. Because no Maryland statute precludes, or even limits, managing members' fiduciary duties under common law, those underlying duties apply.

One Maryland statute governing LLC operating agreements does suggest that provisions within operating agreements could alter existing duties or create other duties that would not otherwise exist. *See* C.A. § 4A–402(a) ("Except for the requirement set forth in § 4A–404 of this subtitle that certain consents be in writing, members may enter into an *operating agreement to regulate or establish any aspect of the* affairs of the limited liability company or the relations of its members . . . ."). The allegations before us indicate that there are no such provisions in this case.

With respect to litigation within the LLC, we note that there is no express provision addressing one member's individ-

ual suit against the LLC or another member, and whether such a suit is limited to an accounting. The statute does contain, however, an entire subtitle (Subtitle 8) devoted to *derivative* litigation. Section 4A–801 of that subtitle sets forth the procedure for bringing such a suit, which, in some respects, mirrors the common law corporate demand/futility scheme. Section 4A–801 provides, in relevant part, as follows:

(a) *Scope of right.*—A member may bring a derivative action to enforce a right of a limited company to recover a judgment in its favor to the same extent that a stockholder may bring an action for a derivative suit under the corporation law of Maryland.

(b) *Conditions under which action may be brought.*—An action under this subtitle may be brought if members with authority to bring the action have refused to bring the action or if an effort to cause those members to bring the action is not likely to succeed.

C.A. § 4A–801(a)–(b).

### 2. *Parties' Contentions*

On appeal, appellees make essentially the same arguments that they made in their motions to dismiss in circuit court. First, they maintain that none of appellants' claims are individual in nature—that all claims are derivative only.

Then, appellees argue that all of appellants' derivative claims fail. With respect to claims on behalf of the partnerships, appellees reason that a general partner may not sue derivatively on behalf of the partnership, and that, even if technically not classified as a "derivative" action, appellants' suit on behalf of the partnerships is barred by § 9A–401(j) because the suit constitutes an act outside the ordinary course of business, and the partners have not unanimously consented to bringing it. They also argue that any conflicts of interest by the partners which might change the analysis are inadequately alleged, factually.

With respect to claims on behalf of the LLCs, appellees argue that the derivative suit is barred due to appellants'

failure to make demand on the LLCs prior to filing suit against Mr. Kay. Failure to make demand, they claim, was unexcused because appellants did not adequately allege that demand would have been "not likely to succeed." According to appellees, the phrase "not likely to succeed" is equivalent to the term "futile" as that word is defined under laws governing demand on corporations.

To refute appellees' contentions, appellants essentially make four substantive arguments on appeal. First, they assert that their claims against Mr. Kay were individual as well as derivative in nature, and that the court erred in holding that appellants' claims were only derivative.

Then, appellants challenge the court's conclusion that a partner in a general partnership may not sue another partner derivatively on behalf of the partnership. Appellants appear to agree with appellees that a partner cannot bring a derivative suit on behalf of the partnership, but only to the extent that the word "derivative" is technically incorrect in the general partnership context. "Derivative" actions, they argue, are only necessary in the corporate and limited partnership settings, where the right of the shareholders or limited partners to sue on behalf of the corporation or limited partnership, respectively,

> is one that, by the rules of internal governance, is given entirely to others, whether the board of directors of a corporation or the general partners of a limited partnership. The right given, appellants argue, is 'derivative' of the relationship of the shareholder or limited partner to those entrusted with governance and provides a mechanism for those not in governance to redress the actions (or inactions) of those who are.

In a general partnership, by contrast, the partners *are* the management of the partnership, and can sue in their own right. Appellants effectively suggest that such suits be described as "suits by one partner on behalf of the partnership," rather than "derivative suits."

That being said, appellants argue that several provisions of the RUPA permit suits on behalf of the partnership (particu-

larly § 9A–401(f), providing that each partner has equal rights in managing the partnership, and § 9A–301, stating that each partner is authorized to act on the partnership's behalf). In appellants' view, § 9A–401(j) does not preclude such a suit because it does not apply. Section 9A–401(j), they argue, is an internal governance provision, which applies to business decisions—not to a suit for breach of duties by a partner (on behalf of the partnership) against another partner. Appellants then argue in the alternative that, even if § 9A–401(j) did apply, an exception to it's application on these facts would be appropriate because, given the other partners'/members' conflict of interest, "it would be impossible for plaintiffs to obtain unanimous (or even majority) consent."

Third, turning to their derivative claims on behalf of the LLCs, appellants argue that demand was excused because demand would have been "not likely to succeed." According to appellants, it is easier to show that demand would have been "not likely to succeed" than to show that demand would have been "futile."

Last, appellants argue that, to the extent they have the right to sue Mr. Kay, they have the right, both individually and on behalf of the investment vehicles, to sue Kay Management and Kay Investment. They contend that both entities are co-liable with Mr. Kay for his torts, either by aiding and abetting him (Counts I, II and III) or by conspiring with him (Counts IX and X). Appellants then argue that, even if they lack the right to sue Mr. Kay, they have the right to sue Kay Management as an independent wrongdoer for conversion (Count IV), breach of Kay Management's management agreements (Count VIII), negligence (Count XI) and unjust enrichment (Count XII).

*3. Principal Issues on Appeal*

 *i. Whether Appellants May Assert Individual Claims Against Mr. Kay*

The crux of appellants' argument that their claims are individual—not purely derivative—is as follows:

Jack Kay breached duties owed to [appellants], individually; those duties were similar to but independent of the duties he owed to the investment vehicles; and [appellants] themselves suffered the injury of which they complain. This is true notwithstanding that all other partners and members suffered the same type of injury.

We conclude that appellants have sufficiently alleged their direct injuries. Whether the allegations would survive summary judgment is another question-one that is not before us today.

Our rationale, like appellants,' hinges on the provisions of RUPA and the rationale in *Shenker v. Laureate Education, Inc.*, the latter a corporate cash-out merger case in which plaintiffs/minority shareholders claimed that directors/majority shareholders breached their fiduciary duties to the plaintiffs by failing to obtain an appropriate price for the cashed-out shares. 411 Md. at 326–27, 983 A.2d 408. The *Shenker* court held that, because the directors were acting outside of their normal managerial duties, they were not protected by C.A. § 2–405.1 and, thus, were subject to direct common law duties of candor and good faith owed to the shareholders. *Id.* at 328–29, 336, 983 A.2d 408. The court concluded, therefore, that plaintiffs had a direct claim against the directors for breach of those duties. *Id.* In distinguishing individual corporate actions from derivative actions, the court stated that, in contrast to a derivative action, a shareholder may bring a direct action against alleged corporate wrongdoers when either (1) the shareholder suffers the harm directly or (2) a duty is owed directly to the shareholder, though such harm may also be a violation of a duty owing to the corporation. *Id.* at 345, 983 A.2d 408.

While we agree with appellees that *Shenker* has a narrow application in the corporate context, its rationale supports the conclusion we reach in this case. Extending the rationale in *Shenker* to the law of partnerships and LLCs, we conclude that appellants have sufficiently alleged that (1) they suffered

the harm directly; and that (2) Mr. Kay, as managing partner/member, violated duties owed directly to appellants.

First, we address the question of direct injury. Appellees argue that appellants, in their original complaint, merely alleged that Mr. Kay lost *reserve* funds. Reserve funds, they argue, belong to the entities—not the individuals who comprise the entities. Appellees argue further that appellants, in their amended complaint, impermissibly attempted to re-characterize those losses as *individual* losses by claiming that the funds lost were reserve funds *and* money that was required to be distributed to appellants.[8]

Appellees belabor a distinction without a difference. Both the original complaint and the amended complaint allege that the investment vehicles were subject to agreements that required funds to be either held in reserve, or distributed to the partners/members. More specifically, the agreements provided that returns on investment were to be distributed to partners and members as available—subject to maintaining adequate reserves. Thus, appellants argue that

> [w]hen [Mr.] Kay unlawfully took the funds that were required to have been distributed to plaintiffs, he injured

---

8. Appellees also set forth two sub-issues. First, they argue that a partner has no right to distributions of profits. They cite the Official Comment to the RUPA § 401, which states:

> Absent an agreement to the contrary, ... a partner does not have a right to receive a current distribution of the profits credited to his account, the interim distribution of profits being a matter arising in the ordinary course of business to be decided by [a] majority vote of the partners.

RUPA § 401, *cmt.* 3. We are unpersuaded. Appellants allege that there are distribution agreements to the contrary, and we accept those allegations for purposes of the motions before us. Next, appellees argue that appellants should not be permitted to amend their complaint to allege that all funds had to be distributed because that allegation is inconsistent with the allegations in the original complaint, and the original allegations constitute judicial admissions. This argument is equally unpersuasive. The proposed amended complaint is not inconsistent with the original complaint; it is merely more expansive. Thus, for that reason and other reasons that we need not articulate, the proposed amended complaint is not barred by the doctrine of judicial admissions.

plaintiffs, and that injury was immediate. When [Mr.] Kay unlawfully took funds that were required to be held in reserves, he injured plaintiffs further because *plaintiffs* would be required to replace the reserves that were lost—by foregoing distributions.

Assuming that those allegations are true, which, under the appropriate standard of review, we are obliged to do, it makes no difference if acts resulting in liability resulted in the loss of funds being held in reserve if those funds would have been distributed in the ordinary course, absent the acts of liability. The allegations indicate that the purpose of the investment vehicles is to produce a return on investments. The goal is to distribute money—not to increase an ownership interest for sale. Cash is either held in reserve or, if adequate reserves are in place, distributed to the investors. In that sense, appellants' goals are unlike the goals of corporate shareholders, who strive to increase stock value and ownership interest. In addition, the type of harm here is not the indirect harm that appellants would suffer if the entities in question were in another type of business. In that situation, the harm would likely be to the value of the business as an operating entity, not the direct loss of cash. Unlike stock and operating assets, money is fungible. Thus, a dollar taken from the investment vehicle reserves must be replaced with a dollar otherwise available for distribution. The immediacy of the distribution does not matter. Thus, the alleged losses in this case are direct, individual losses to appellants.

Turning to the second prong of *Shenker*, we conclude that appellants have adequately alleged that Mr. Kay violated duties that he owed directly to appellants, which were independent of the duties he owed to the investment vehicles. The contractual, statutory, and fiduciary duties imposed on Mr. Kay as the managing partner/member of the investment vehicles run to both the investment vehicles themselves, *and* the partners/members.

More specifically, with respect to Mr. Kay's obligations to the other *partners*, we note first that general partnerships are governed by partnership agreements, and that general part-

ners are in contractual privity with each other. Further, as detailed above, general partners owe each other—not just the partnership—fiduciary duties under RUPA. Indeed, § 9A–405(b) of the RUPA clearly provides a mechanism through which partners can sue other partners directly for breach of those obligations and others. *See* C.A. § 9A–405(b) ("A partner may maintain an action against the partnership or another partner" to "[e]nforce the partner's rights under the partnership agreement" or to enforce the partner's rights under title 9A, including § 9A–401, § 9A–403, and § 9A–404).

With respect to Mr. Kay's obligations to the other *members*, we note again that members of an LLC are frequently parties to operating agreements. Thus, members, like partners, are in contractual privity with each other. Moreover, as discussed above, managing members of LLCs owe fiduciary duties to each other—not just the LLC itself.

The fact that the LLCs and partnerships themselves have suffered the same injury, along with the members/partners other than appellants, is of no moment when the injury is direct. *Shenker*, 411 Md. at 345, 983 A.2d 408.

We conclude further that an accounting prior to appellants' direct enforcement of their individual claims is unnecessary in this case. Even before the RUPA, there were exceptions to the accounting rule. *See generally*, Burkhard § 4.01. The exceptions are not applicable here, except for the following: (1) when an accounting is unnecessary because the matter does not require a full review of partnership accounts; and/or (2) when the action is for injuries suffered directly and not derivatively and recovery can be awarded without adjusting the financial affairs of the partnership. *Id.* In this instance, appellants can pursue the alleged breach of the partnership agreement and the alleged breach of duty owed to them and, if successful, recover their own losses. Any recovery would go directly to appellants. Thus, appellants' actions can be pursued without necessarily reviewing all of the partnership business, and without necessarily adjusting the financial affairs of the partnership. Moreover, because law and equity

courts have merged, we fail to see why a court cannot determine the appropriate disposition and provide appropriate relief regardless of the form of the action. In that regard, the court can determine what is triable by a jury and what must be tried by the court.

ii. *Whether Appellants May Bring the Investment Vehicles' Claims Derivatively on Behalf of the Investment Vehicles*

### A. Claims on Behalf of the Partnerships

Appellants argue that, although the term "derivative" is inappropriate in the partnership context, the RUPA permits minority partners to bring partnership claims against another partner on behalf of the partnership. The law is unsettled on this point. As explained below, we shall affirm the circuit court's ruling with respect to derivative claims.

We agree that the term "derivative" is an inappropriate and confusing term to use in the general partnership context. "Derivative" actions are necessary in the corporate and limited partnership context, where the shareholders and limited partners have no managerial rights and thus must "derive" the right to sue from the entity itself. Unlike shareholders and limited partners, however, general partners all have the ability to act on behalf of the partnership, and all have management rights. *See* C.A. § 9A–301(1) (describing partners' role as agents of the partnership); § 9A–401(f) (guaranteeing each partner "equal rights in the management and conduct of the partnership business"). Thus, general partners have no need for "derivative" action. This explains the Official Comment to § 405 of the RUPA, which states that "[s]ince general partners are not passive investors like limited partners, RUPA does not authorize *derivative* actions, as does [the Revised Uniform Limited Partnership Act] Section 1001." RUPA § 405, *cmt.* 2 (emphasis added).

The appropriate question, then, is not whether a general partner may sue "derivatively," but whether minority general partners may bring partnership claims against another part-

ner or a third party on behalf of the partnership. Section 9A–405(a) of the RUPA provides that "[a] *partnership* may maintain an action against a partner for breach of the partnership agreement, or for the violation of a duty to the partnership, causing harm to the partnership." C.A. § 9A–405(a) (emphasis added).

Sections 9A–401(g) and 9A–401(f) of the RUPA suggest that any partner may sue to enforce a partnership claim. Under § 9A–401(g), partners have a right to possess partnership property for partnership purposes. C.A. § 9A–401(g) ("A partner may use or possess partnership property only on behalf of the partnership."). The leading treatise on partnership law suggests that that provision "can reasonably be construed to permit any partner to enforce a partnership right in the interest of the partnership." Bromberg and Ribstein § 5.03(d) (citations omitted). Likewise, § 9A–401(f) can, according to the same treatise, "be reasonably read to mean that any partner can enforce a partnership obligation." *Id.* at § 5.03(b). This is because "[t]he enforcement of a partnership's rights in contract, tort, ownership, or otherwise is an aspect of the management and conduct of the partnership business." *Id.* Consequently all partners have equal ability to enforce those rights. *Id.*

What form of partnership consent is required to enable that enforcement? Appellees argue that § 9A–405(j) requires the unanimous consent of all the partners (other than Mr. Kay himself)[9] because suit against Mr. Kay is "outside the ordinary course of business." Appellants counter that § 9A–405(j) does not apply to litigation against another partner, and that, even if it ordinarily would, its application would be unfair in this case because "it would be impossible for [appellants] to obtain unanimous (or even majority) consent" given the other partners'/members' conflicts. Further, appellants stress that it would be ironic if § 9A–405(j) were construed to bar their claims against Mr. Kay, because that would effectively enable

---

**9.** Appellees have conceded, for purposes of the motions before us, that the unanimity requirement does not include Mr. Kay's consent.

"[Mr.] Kay ... [to say] to the Court, 'Well, I took the money without the consent of my partners, but you can't come get me without the consent of all the partners.'"

We agree with appellees that § 9A–405(j) would normally apply to a suit on behalf of the partnership.[10] The intent of the section is for partnerships to conduct business based on collective business judgment, not on the whim of a partner. Such a suit against a third party might be outside the ordinary course of business, but it is likely that a suit against another partner would be outside the ordinary course of business. *See* Bromberg and Ribstein § 5.03(c) ("A claim against one or more of the partners probably should not be considered an ordinary matter...."). However, § 9A–405(j)'s effect should be tempered when non-plaintiff partners have conflicts of interest. The unanimity requirement should not apply to defendant partners and other interested partners. *See Id.* § 5.03(c) ("There are equitable reasons to apply the majority or unanimity requirements only to the disinterested partners when some partners have a conflict of interest as to the enforcement—as opposed to a disagreement about the wisdom of enforcement."). Thus, the partnership claim may be enforced by all of the *disinterested* partners.

That rationale is consistent with the Fifth Circuit's reasoning in *Cates v. International Tel. & Tel. Corp.,* 756 F.2d 1161 (5th Cir.1985), in which the court stated that a partner ought to be able to enforce a partnership claim in "exceptional circumstances." *Id.* at 1176, 1183. The court continued:

> What we do hold is that in a proper case—one where the controlling partners, for improper, ulterior motives and not because of what they in good faith believe to be the best interests of the partnership, decline to sue on a valid, valuable partnership cause of action which it is advantageous to the partnership to pursue—Texas law would afford some remedy to the minority partner or partnership inter-

---

**10.** For the sake of clarity, we note that § 9A–401(j) is an internal governance provision that would not affect an individual partner's claims against another partner.

est owner other than merely a damage or accounting suit against the controlling partners, at least where the latter would not be reasonably effective to protect the substantial rights of the minority.

The leading treatise on partnership law suggests further that there may be a need for derivative suits when actions for accounting, dissolution, and contribution are insufficient. *Id.* § 5.05. That need would appear to exist when a majority of directors have a conflict of interest.[11]

■■■ On the facts before us, however, there is no need for a suit on behalf of the partnerships because appellants have adequately alleged *individual direct* injury.[12] If appellants prove their allegations, they will be afforded complete relief. The allegations indicate that no partners/members other than appellants have any interest in bringing claims on behalf on themselves or on behalf of the investment vehicles.

We perceive no reason to permit an action on behalf of the entities. The entities exist to produce money. In many ways, they are unlike other entities, such as industrial, commercial or retail operations, in which a breach of contract or tort duty results in harm to the enterprise that may not necessarily and directly affect partners' and members' accounts. Moreover, there does not appear to be a risk of multiple actions against Mr. Kay.

---

**11.** Needless to say, any recovery gleaned from a successful suit on behalf of the partnership belongs to the partnership—not the individual plaintiffs. Thus, "[i]f fewer than all of the partners succeed in enforcing a partnership right, they hold in trust for the partnership any recovery or must account to the partnership for it, unless the other partners consent." Bromberg and Ribstein § 5.03(a); *see also id.* § 5.03(d) ("A partnership claim or cause of action is partnership property and does not belong to any partner individually. Thus, a partner cannot sue in his or her own name to enforce a partnership claim individually, that is, to keep the recovery personally.").

**12.** We decline, therefore, to assess the adequacy of appellants' allegations of personal conflict.

## B. Claims on Behalf of the LLCs

 We reject appellants' derivative claims on behalf of the LLCs for the same reasons noted above.[13] Nevertheless, because the parties have briefed the issue, and there is no reported opinion addressing the issue, we shall discuss whether "not likely to succeed" under C.A. § 4A–801(b) equates to "futility," as that term is used in the corporate context. Section 4A–801(a) provides that "[a] member may bring a derivative action to enforce a right of a limited liability company to recover a judgment in its favor *to the same extent that a stockholder may bring an action for a derivative suit under the corporation law of Maryland.*" C.A. § 4A–801(a) (emphasis added). Where possible, statutes should be read in harmony with each other. *Whack v. State*, 338 Md. 665, 673, 659 A.2d 1347 (1995) ("When we are called upon to interpret two statutes that involve the same subject matter, have a common purpose, and form part of the same system, we read them in *pari materia* and construe them harmoniously."). That is particularly true as to provisions within the same section. *Id.* If one reads subsection (b) in conjunction with subsection (a), it is clear that the legislature intended the phrase "not likely to succeed" to equate with "futility."

### 4. Application and Resolution

We apply the above conclusions to appellants' proposed amended complaint and conclude that appellants have stated a cause of action *as to direct claims only* as follows.

#### i. Count I

 Count I is against Mr. Kay for fraud and against Kay Management and Kay Investment for aiding and abetting Mr. Kay in his fraudulent acts. Appellants adequately alleged fraud on Mr. Kay's part. The aiding and abetting allegations also suffice to survive a motion to dismiss. *See Alleco*, 340

---

13. Again, we are left with no reason to appraise the sufficiency of appellants' allegations of conflict.

Md. at 199–201, 665 A.2d 1038 (recognizing aider and abettor tort liability to the extent the underlying tort exists).

Appellees argue that the aiding and abetting allegations against Kay Investment and Kay Management fail because Mr. Kay was in fact the person facilitating those entities' involvement in the Madoff investments, and Mr. Kay could not have "aided and abetted himself." We are unpersuaded by this argument.

Both the original and amended complaints state that Mr. Kay was, at all times material to the litigation, the president or chief executive officer of Kay Management (a Maryland corporation), and that "Mr. Kay owns or controls all of the interest of Kay Management." Both complaints state that Kay Investment (a Maryland LLC) was "formed by defendant Kay and his now-late wife, Ina Kay," and that Mr. Kay "is the managing member of [Kay Investment] and at all times material hereto was in sole control of [Kay Investment]." Appellants allege that Mr. Kay acted in his own interest, not within the scope of authority extended to him.

A corporation is a separate legal entity, with an existence independent of the individuals who compose it. Kay Management and Kay Investment are thus separate legal entities from Mr. Kay himself, with the capacity of aiding and abetting Mr. Kay, while Mr. Kay was acting in his own interest. *See, e.g., U.S. v. Sain,* 141 F.3d 463, 466, 474 (3rd Cir.1998) (rejecting the argument that the president and sole shareholder of a corporation could not criminally aid and abet the corporation); *see also U.S. v. Cole,* No. 3:07–00093, 2007 WL 2600920, at *6–7, 2007 U.S. Dist. LEXIS 67544, at *17–18 (M.D.Tenn. Sept. 10, 2007) (rejecting defendant's argument that he cannot "aid and abet himself" or his wholly owned company, stating that "even a corporation wholly owned by one shareholder has the capacity of being aided and abetted"); *Beaupre v. Smith & Assocs.,* 50 Mass.App.Ct. 480, 494–95, 738 N.E.2d 753, 766 (2000) (rejecting the idea that a company's president and controlling shareholder could not aid and abet the company's sexual harassment of the company's former

employee, reasoning that such an idea is "legally and conceptually incorrect" because the company "is a viable legal person separate and distinct from its shareholders, officers and employees, possessing virtually all of the legal attributes of a natural person"); *State by McClure v. Sports & Health Club, Inc.,* 370 N.W.2d 844, 853–54 (Minn.1985) (holding that the sole owners of a corporation were not liable for aiding and abetting the corporation's discriminatory practices but only because the corporate veil had already been pierced, thus ending the individual owners' legal distinction from the corporation and the legal basis for an aiding and abetting claim). *Compare K & K Mgmt. v. Lee,* 316 Md. 137, 170–71 n. 14, 557 A.2d 965 (1989) (rejecting "an analysis under which corporate officers, agents or employees, *acting on behalf of a corporation within the scope of their authority,* are viewed as actors ... separate from their corporation ... [who can thereby] maliciously interfere with business relations between their corporation ... and the plaintiff...." (Emphasis added.)).

### ii. Count II

 Count II is against Mr. Kay for breach of his fiduciary duties to the investment vehicles and each of the partners/members thereof, and against Kay Management and Kay Investment for aiding and abetting Mr. Kay's breach. Appellants have adequately alleged that Mr. Kay owed them fiduciary duties, but whether the *breach* of those duties constitutes a separate cause of action at law for monetary damages is another question. In *Kann v. Kann,* 344 Md. 689, 690 A.2d 509 (1997), a leading case on breach of fiduciary duty, the Court of Appeals held as follows:

> [T]here is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries. This does not mean that there is no claim or cause of action available for breach of fiduciary duty. Our holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion. Counsel are required to identify the particular fiduciary relationship involved, identify how it was breached, consider the reme-

dies available, and select those remedies appropriate to the client's problem. Whether the cause or causes of action selected carry the right to a jury trial will have to be determined by an historical analysis.

Several cases in the wake of *Kann* have held similarly. *See Int'l Bhd. of Teamsters v. Willis Corroon Corp.*, 369 Md. 724, 727 n. 1, 802 A.2d 1050 (2002) (treating a complaint by a labor organization against its insurance broker for negligence and breach of fiduciary duty as a complaint for negligence alone, and reasoning that "although the breach of a fiduciary duty may give rise to one or more causes of action, in tort or in contract, Maryland does not recognize a separate tort action for breach of fiduciary duty"); *Vinogradova v. Suntrust Bank, Inc.*, 162 Md.App. 495, 510, 875 A.2d 222 (2005) (combining plaintiff's breach of fiduciary duty count and negligence count into a single negligence count where a third-party agent of a customer of a financial institution allegedly mismanaged customer's funds and investment accounts); *G.M. Pusey and Assocs., Inc. v. Britt/Paulk Ins. Agency, Inc.*, No. RDB–07–3229, 2008 WL 2003747, at *6–7, 2008 U.S. Dist. LEXIS 37525, at *18–20 (D.Md. May 6, 2008) (holding that plaintiff, wife of deceased insurance specialist, had no claim of breach of fiduciary duty against an insurance agency that the insurance specialist worked with because "Maryland does not recognize an independent cause of action for breach of fiduciary duty" and plaintiff had alternative remedies, including a "breach of contract claim, in which a breach of fiduciary duty may be a part").

*Kann* and its progeny do not obliterate the possibility of a separate cause of action for breach of fiduciary duty in an action seeking equitable relief. In a claim for monetary damages at law, however, an alleged breach of fiduciary duty may give rise to a cause of action, but it does not, standing alone, constitute a cause of action. Here, the allegations in the count are relevant to other causes of action alleged (*e.g.,* fraud, tortious interference, breach of contract, and negligence), but they do not constitute a stand alone nonduplicative

cause of action. Consequently, as to Count II, we affirm the circuit court's ruling.

### iii. Counts III & IV

 Appellants have failed to state a claim under Count III (against Mr. Kay for conversion and against Kay Management and Kay investment for aiding and abetting that conversion) and Count IV (against Kay Management alone for conversion). One cannot convert monies unless the monies alleged to have been converted are "specific, segregated, or identifiable funds," and the funds allegedly converted in this case do not meet that test. *Lasater v. Guttmann,* 194 Md. App. 431, 447 (2010) ("The general rule is that monies are intangible, and therefore, not subject to a claim for conversion.") (citing *Allied Inv. Corp. v. Jasen,* 354 Md. 547, 564, 731 A.2d 957 (1999)). Needless to say, the aiding and abetting claim under Count III fails for lack of an underlying tort of conversion. *See Alleco,* 340 Md. at 199–201, 665 A.2d 1038 ("[C]ivil aider and abettor liability, somewhat like civil conspiracy, requires that there exist underlying tortious activity in order for the alleged aider and abettor to be held liable.").

### iv. Counts V & VI

Appellants' amended complaint adequately alleges a cause of action in Count V (against Mr. Kay for tortious interference) and in Count VI (against Mr. Kay for breach of the investment vehicles). The allegations are summarized in the Factual Background section above, and need not be reiterated.

### v. Count VII

 Appellants have also failed to state a cause of action as to Count VII (against Mr. Kay alone for breach of the Kay Investment operating agreement). Appellants are not members in Kay Investment. Thus, Mr. Kay owes no contractual duty to appellants based on the Kay Investment operating agreement.

*vi. Count VIII:*

■ Appellants have not stated a direct, individual cause of action as to Count VIII, which is against Kay Management alone for breach of the management agreements it entered with six of the investment vehicles. Such a claim could appropriately be brought by the investment entities themselves, but not appellants. We reach this conclusion regardless of the fact that under § 9A–306 of the RUPA, the individual partners of the partnership investment vehicles would be subject to personal liability if Kay Management sued on the same management contracts. *See* C.A. § 9A–306(a) ("Except as otherwise provided in subsections (b) and (c) of this section, all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by the law."). Under that scenario, the individual partners might be able to assert a breach of contract by Kay Management in *defense.* On the facts of this case, we decline to recognize an individual right to sue on the management contracts.

*vii. Count IX:*

■ Appellants also failed to state a cause of action under Count IX, against Mr. Kay, Kay Investment, and Kay Management for civil conspiracy to convert the investment vehicles' funds. There can be no conspiracy to commit conversion of monies because, as described above, one cannot convert monies. In the absence of even the possibility of the underlying tort of conversion, the conspiracy claim fails. *See Shenker,* 411 Md. at 351, 983 A.2d 408 ("We ... hold that a defendant may not be adjudged liable for civil conspiracy unless that defendant was legally capable of committing the underlying tort alleged."); *Domchick v. Greenbelt Consumer Services,* 200 Md. 36, 87 A.2d 831 (1952) ("No action in tort lies for conspiracy to do something unless the acts actually done, if done by one person, would constitute a tort"). Appellants have not alleged any other underlying tort, such as breach of fiduciary duty owed by Kay Management and Kay Investment

directly to appellants. Thus, appellants have not adequately stated a cause of action for conspiracy.[14]

### viii. Count X:

■ Count X is against all three appellees for statutory conspiracy to injure Barcroft alone. Appellants claim that under Va.Code § 18.1–500, appellees are subject to treble damages for engaging in such conspiracy.

Barcroft is considered a "partnership" under the Maryland RUPA, which defines a partnership as "an association of two or more persons to carry on as co-owners [of] a business for profit formed under § 9A–202 of this title, predecessor law, *or comparable law of another jurisdiction* ...." C.A. § 9A–101(i) (emphasis added). Section 9A–106(a) provides that "[e]xcept as provided in subsection (b) of this section, the law of the jurisdiction in which a partnership has its *chief execu-*

---

**14.** Appellees argue that appellants' conspiracy claim should also fail under what federal courts have called the "intracorporate conspiracy doctrine." Under that theory,

> acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. In essence, this means that a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.

*Baltimore–Washington Telephone Co. v. Hot Leads Co., LLC,* 584 F.Supp.2d 736, 744 (D.Md.2008). However, a recognized exception to the rule permits intracorporate conspiracy claims where the agent "has an independent personal stake in achieving the corporation's illegal objective." *Greenville Publishing Co., Inc. v. Daily Reflector, Inc.,* 496 F.2d 391, 399 (4th Cir.1974). That exception is applicable in this case. The allegations are that Mr. Kay acted for his own benefit. For example, appellants claim that Mr. Kay was "blinded by the ambition of being one of the 'exclusive' and elite members of the Madoff 'club.'" Appellants suggest that Mr. Kay merely used Kay Management and Kay Investment as means to achieve his ends. For instance, appellants claim that Mr. Kay "took the monies by unilaterally making each of the investment vehicles a 'member' of [Kay Investment], ... whose *sole purpose was to invest with Madoff;* and by *causing* Kay Management, which he controlled, to invest those monies in [Kay Investment] ...." (emphasis added). Thus, Mr. Kay and the two entities he controlled were separate legal entities for conspiracy purposes. This rationale is consistent with our reasons for permitting some of appellants' aiding and abetting claims to stand. Ultimately, then, Count IX fails, but not on the intracorporate conspiracy theory.

*tive office* governs relations among the partners and between the partners and the partnership." C.A. § 9A–106(a) (emphasis added). Subsection (b) pertains to foreign limited liability partnerships, and is therefore inapplicable. The determinative question, therefore, is where are the investment vehicles' chief executive offices?

The resident agents' addresses, as indicated on the original complaint, are in Bethesda, Maryland. Likewise, the addresses of the other partners/members (nominal defendants in the original complaint) are in Maryland, Washington D.C., California, or Idaho. There are no Virginia addresses listed. Neither appellants' complaints, nor their briefs, ever claim that Barcroft operates principally out of Virginia. Appellants allege only that Barcroft is "a Virginia general partnership" (presumably meaning that it was formed under the laws of Virginia) and that it "owns a rental housing project consisting of 370 garden apartments in 30 buildings located in Falls Church, Virginia." [15]

Maryland Rule 8–504(a)(4), requires parties to supply this Court with "[a] clear concise statement of the facts material to a determination of the questions presented." *See also State Rds. Comm'n v. Halle,* 228 Md. 24, 32, 178 A.2d 319 (1962) ("Surely it is not incumbent upon this Court, merely because a point is mentioned as being objectionable at some point in a party's brief, to scan the entire record and ascertain if there be any ground, or grounds, to sustain the objectionable feature suggested."). Because appellants have not adequately demonstrated why Virginia applies, we conclude that Count X does not state a cause of action.

*ix. Count XI:*

■ Count XI is against Mr. Kay and Kay Management for negligence, gross negligence and reckless misconduct. Appellants have adequately stated a cause of action against

---

**15.** In their reply brief, appellants also state that Virginia is "the home of the investment vehicle known as Barcroft."

Mr. Kay in his capacity as *partner* for gross negligence and reckless conduct, but not for mere negligence. Under § 9A–404(c) of the RUPA, "[a] partner's duty of care to the partnership and the other partners in the conduct and winding up of the partnership business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." C.A. § 9A–404(c). No such statutory limitation protects members of LLCs, however, and appellants have adequately alleged that Mr. Kay, in his capacity as *member,* committed all three torts.

By contrast, appellants have stated no direct cause of action against Kay Management for negligence, gross negligence or reckless misconduct. If Kay Management owed any non-intentional tort duties, it owed them to the investment vehicles themselves—not to appellants individually. Such tort claims would be more appropriately pursued by the entities themselves.

### X. Count XII:

Count XII, against Kay Management for unjust enrichment based on Kay Management's receipt of fees for the fictitious Madoff income, fails for the same reasons that Counts VIII and XI fail.

Finally, we conclude that appellants are not entitled to punitive damages on any claims. With respect to appellants' breach of contract and negligence causes of action, punitive damages are not legally available. *See Sims v. Ryland Group, Inc.,* 37 Md.App. 470, 475, 378 A.2d 1 (1977) ("It is well settled in Maryland that punitive damages cannot be awarded in a pure breach of contract case, although they are recoverable in tort actions arising out of contractual relationships where actual malice is present."); *Owens–Illinois v. Zenobia,* 325 Md. 420, 463, 601 A.2d 633 (1992) (holding in the context of products liability that "negligence alone, no matter how gross, wanton, or outrageous, will not satisfy [the] standard [of actual malice]," which must be satisfied in order to award punitive damages). With respect to all causes of action, we

conclude that the allegations are factually insufficient to support a claim for punitive damages. It is "abundantly clear that with respect to both intentional and non-intentional torts, . . . an award of punitive damages must be based upon actual malice, in the sense of conscious and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud." *Scott v. Jenkins,* 345 Md. 21, 33, 690 A.2d 1000 (1997) (citations and quotations omitted); *see also Ellerin v. Fairfax Savings,* 337 Md. 216, 240, 652 A.2d 1117 (1995) (holding that not all fraud actions give rise to punitive damages; the fraud must be committed with actual malice, which amounts to "a person's actual knowledge that his statement is false, coupled with his intent to deceive another by means of that statement"); *Siegman v. Equitable Trust Co.,* 267 Md. 309, 297 A.2d 758 (1972) (applying the "actual malice" standard to the question of punitive damages for conversion); *Rinaldi v. Tana,* 252 Md. 544, 545, 250 A.2d 533 (1969) (permitting punitive damages in a case involving tortious interference with a contract where the defendant "purposely and maliciously for his own unjustified and selfish reasons had induced his sister not to perform the contract. . . ."). In any tort action, "a plaintiff must establish by clear and convincing evidence the basis for an award of punitive damages." *Zenobia,* 325 Md. at 463, 601 A.2d 633. The alleged facts, if proved, simply do not demonstrate actual malice.

**ORDER GRANTING MOTIONS TO DISMISS WITH PREJUDICE REVERSED; ORDERS DENYING APPELLANTS' MOTION FOR LEAVE TO AMEND AND GRANTING APPELLEES' MOTION TO STRIKE THE AMENDED COMPLAINT GRANTED IN PART AND DENIED IN PART; LEAVE TO FILE AN AMENDED COMPLAINT CONSISTENT WITH THIS OPINION GRANTED; MOTION TO STRIKE SPECIFIED PORTION OF APPELLANTS' REPLY BRIEF DENIED, BUT ALTERNATIVE RELIEF GRANTED IN THAT THIS COURT HAS NOT CONSIDERED THE CONTESTED MATERIAL. COSTS TO BE PAID ONE-THIRD BY APPELLANT THE GEORGE WASSERMAN AND JANICE WASSER-**

MAN GOLDSTEN FAMILY LIMITED LIABILITY COM-
PANY, ONE–THIRD BY APPELLANT ANTHONY TAN-
ZI, AS TRUSTEE OF THE LISA W. GILL TRUST, AND
ONE–THIRD BY APPELLEE JACK KAY.

