501 A.2d 35

**Carolyn W. CRAMER**

v.

**HOUSING OPPORTUNITIES COMMISSION OF MONTGOMERY COUNTY.**

**No. 135, Sept. Term, 1984.**

Court of Appeals of Maryland.

Dec. 12, 1985.

Burt A. Braverman (Frances J. Chetwynd and Cole, Raywid & Braverman, Washington, D.C., and Joseph W. Pitte-

rich, Pitterich & Snedegar, P.C., Chevy Chase, on brief), for appellant.

Daniel Karp (Donald C. Allen and Allen, Thieblot & Alexander, on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

McAULIFFE, Judge.

This claim of negligent hiring was brought by Carolyn W. Cramer (Cramer) against the Housing Opportunities Commission of Montgomery County (the "HOC") for damages resulting from a sexual assault. Cramer alleged and proved that in early March, 1976 she was raped in the townhouse she rented from the HOC, and that her assailant was George P. Slater (Slater),[1] a housing inspector employed by the HOC. Cramer contended the HOC was negligent in hiring Slater for a sensitive position without having any basis to believe he was trustworthy, and without having made any reasonable inquiry to ascertain his fitness for that position. She offered evidence that Slater had been convicted earlier in the Circuit Court for Montgomery County of robbery and assault, and in the District of Columbia of burglary, and that at the time of his hiring approximately two months before the assault, he was under indictment in Montgomery County for rape and related offenses.[2] The case was submitted to the jury on special

---

**1.** The HOC stipulated that Slater was the assailant.

**2.** Slater had been charged in the United States District Court for the District of Columbia in 1969 with first degree burglary, sodomy, rape and robbery, all arising out of an incident of January 19, 1968. He pled guilty to the burglary count, and the remaining charges were dismissed. Two indictments were filed against Slater in the Circuit Court for Montgomery County in January of 1970, both arising out of an incident of November 18, 1969. The first indictment charged assault with intent to rape and assault and battery, and Slater ultimately pled guilty to assault and battery. The second indictment charged robbery, assault with intent to rob, assault and battery and larceny, and the defendant pled guilty to robbery. All counts other

interrogatories and the jury found Cramer had not proven the HOC "was negligent in hiring Mr. Slater." [3] Following the entry of a judgment *nisi* in favor of the HOC the trial judge entered an order finding there was no legally sufficient evidence to establish a causal relationship between any negligence of the HOC and the attack upon Cramer.[4] Cramer appealed to the Court of Special Appeals, but that court found no error. *Cramer v. Housing Opportunities Comm'n,* 60 Md.App. 253, 482 A.2d 156 (1984). We granted certiorari and we reverse because of error in the exclusion of evidence concerning Slater's record of criminal convictions and the accessibility of that information to the HOC.

Appellant separated from her husband in the Spring of 1974 and moved with her twin children, then two years of age, to a rented townhouse located in a development known as Pomander Courts, in Montgomery County. In November of 1975 the townhouse development was purchased by the HOC, a public agency providing subsidized housing for

---

than those to which he pled guilty were dismissed. He was sentenced to five years imprisonment on each Maryland conviction, and 20 months to five years on the District of Columbia conviction, and all sentences were made concurrent. He was imprisoned from 1969 until 1973. Appellant also proffered testimony that Slater had received a general discharge from the Army in 1968, and that during his two years of military service he had been hospitalized for emotional instability, and placed in the stockade for being AWOL. There was no evidence that the military service information would have been reasonably available to a prospective employer. Additionally, Appellant offered evidence that at the time of hiring, Slater's driving privileges had been suspended in Maryland, but the trial judge rejected this evidence on the ground that Slater was not being employed as a driver of the agency's vehicles.

**3.** Cramer's suit also included a claim against Slater, which Slater did not defend. The jury found damages in the amount of $500,000.00 on that claim.

**4.** Judge Cave had reserved ruling on the HOC's motion for a directed verdict made at the close of the evidence, and prudently decided the motion following the jury verdict in order to preserve an important additional issue for possible appellate review.

qualified individuals.[5]  At about the same time, the HOC entered into a contract with Montgomery County to employ a building inspector and three maintenance workers from among unemployed persons qualified for federally subsidized employment under Title VI of the Comprehensive Employment Training Act ("CETA").  Montgomery County's CETA program was administered by its Office of Human Resources ("OHR"), which agreed to screen all applicants to ensure that they were unemployed residents of Montgomery County and eligible under the CETA program.

On December 9, 1975 Slater submitted an application for the position of housing inspector to the Montgomery County Employment Service Center, a part of the OHR.  Employees of the employment center confirmed Slater's residence in Montgomery County and forwarded his application to the HOC with advice that Slater was CETA–qualified.  No one at the employment center questioned Slater concerning any matter relating to his trustworthiness, nor was any effort made to verify other information contained in the application.

The HOC employment interview was conducted by Charles Bryant, a maintenance superintendent.  Bryant asked Slater five questions, all pertaining to his previous work experience.  Bryant did not question Slater concerning parts of the application that were not completed, nor did he ask any questions intended to provide information relating to Slater's trustworthiness.[6]  The application revealed that Slater had quit high school in 1965, served in the Army,

---

**5.** For a discussion of the genesis and character of housing authorities in this state *see Jackson v. Housing Opp. Comm'n,* 289 Md. 118, 120–22, 422 A.2d 376 (1980).

**6.** Apparently in an attempt to avoid discrimination in hiring, CETA officials had notified the HOC that all applicants for the same position should be asked the same quesitons, and that the questions were to be submitted to a CETA counselor in advance of the interviews.  Bryant had prepared the questions for this position and concluded he should not go beyond them.

and had worked for Kenneth Downs from April, 1973 to January, 1974, and for Robert Bobb from February to September of 1974. A portion of the application requesting dates of military service was not completed, and questions asking whether the applicant had ever been dismissed or asked to resign from any position were not answered. Although Bryant was not particularly pleased with any of the three persons he interviewed for the position, he recommended Slater upon being advised there were no other CETA-qualified applicants, and with the realization that if the position was not filled promptly, federal funding for it would probably be lost.

Bryant's recommendation was forwarded to Bernard Tetrault, Executive Director of the HOC, in the form of a payroll change authorization form that included no information about Slater except his name, address, Social Security number and date of birth. Tetrault signed the authorization without reviewing the employment application, and apparently without discussing the matter with Bryant. Neither Bryant, Tetrault nor any other employee of the HOC called or contacted either person listed by Slater as a previous employer, or any person listed as a personal reference, nor did they attempt any verification of the information furnished by Slater or undertake any independent investigation of him.

Slater's employment as a housing inspector commenced on December 23, 1975. His duties consisted of periodically inspecting rental units of the HOC and submitting a report to the maintenance division of items needing repair or replacement. Each inspection was comprehensive, covering every room of the unit by following a predetermined and systematic routine. Appointments for inspections were made with the tenants by a secretary in the maintenance office, and it was the normal practice to conduct an inspection in the presence of the tenant. Keys for all units were kept in Bryant's office, and were used to gain access to the units in those instances where the tenant had consented in

writing to an inspection or the making of repairs in the tenant's absence.

Appellant testified that Slater inspected her townhouse on February 13, 1976, and that the inspection lasted about 45 minutes and included every room. During the inspection Slater asked a number of questions, including one unauthorized inquiry concerning the number and identity of the occupants of the townhouse. Appellant provided all requested information, including the fact that she and her two children were the sole occupants of the home.

In the hours of darkness during the evening of March 2 or the early morning of March 3, Slater returned to Appellant's townhouse and assaulted her. The evidence indicated Slater probably gained access to the home through an open kitchen window on the ground level.[7]

Appellant's claim is that the HOC failed to use reasonable care in ascertaining the fitness of Slater for a position that not only brought him in contact with tenants but also gave him access to their homes, and under some circumstances to the keys to their homes. In *Evans v. Morsell*, 284 Md. 160, 166–67, 395 A.2d 480 (1978), we said:

> Where an employee is expected to come into contact with the public ... the employer must make some reasonable inquiry before hiring or retaining the employee to ascertain his fitness, or the employer must otherwise have some basis for believing that he can rely on the employee. The nature and extent of the inquiry that is needed will naturally vary with the circumstances. (Citations omitted.)

Appellant, as a tenant, was clearly a person to whom the HOC owed a duty of reasonable care in the hiring of a housing inspector. Equally clear is the existence of evi-

---

**7.** The front door remained locked and chained, and Appellant testified she had locked the patio door before retiring. There was evidence that the kitchen window was frequently left open to allow heat from the kitchen to escape, and there was evidence that this window had in fact been open on the evening of the assault.

dence from which the jury could have found a breach of that duty. Notwithstanding the sensitive nature of the position to be filled, the HOC accepted an incomplete application for employment, made inquiry of the applicant only as to work experience, and failed to undertake even the most rudimentary investigation either to verify the sparse information furnished or to otherwise gather independent information concerning the fitness of the employee.

If, as appears likely, the HOC undertook no investigation of Slater because of a belief that the OHR had done so, it had no right to make that assumption. The contract between the HOC and Montgomery County required only that the OHR screen applicants for confirmation of county residency and CETA eligibility, and the HOC had no reasonable basis to assume that more would be done. Additionally, as the HOC conceded at trial, its duty to exercise reasonable care in the selection of a housing inspector was not delegable. *Athas v. Hill,* 300 Md. 133, 148–49, 476 A.2d 710 (1984); *Wood v. Abell,* 268 Md. 214, 238–39, 300 A.2d 665 (1973); *Jarka Co. v. Gancl,* 149 Md. 425, 431, 131 A. 754 (1926).[8]

To establish a cause of action in negligence, a plaintiff must prove the existence of a duty owed by a defendant to him (or to a class of which he is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages. *Scott v. Watson,* 278 Md. 160, 165, 359 A.2d 548 (1976); *Peroti v. Williams,* 258 Md. 663, 669, 267 A.2d 114 (1970). One who breaches a duty owed to another is said to

---

**8.** Although the trial judge properly instructed the jurors that the duty was non-delegable, he also allowed them to consider whether the HOC's "acceptance of the information that they had of how [employees] were hired from CETA was reasonable under the circumstances." For the guidance of the trial court on remand, we point out that the reasonableness of the HOC's reliance upon OHR or CETA officials to make an investigation was not properly before the jury. There was a breach of duty by the HOC if the inquiry was inadequate under the circumstances, and whether the HOC "reasonably" relied on someone else to conduct the inquiry is of no importance.

be negligent, but that negligence is actionable only if it is a proximate cause of damage. In this case there was legally sufficient evidence to prove three of the four elements of the cause of action—duty, breach, and damage, and those three concepts are rather easily understood. Somewhat more complicated in the context of this case is the concept of proximate cause—the legally cognizable nexus between the breach of duty and the damage suffered. This is so because the plaintiff must prove two links in the causal chain to establish the ultimate connection in this case.

First, she must prove that the failure of HOC to undertake a reasonable inquiry resulted in the hiring of Slater. If, for example, a reasonable inquiry would probably not have produced any information that would have persuaded a reasonable employer to refuse employment for the position sought, the failure to conduct an inquiry, though negligent, would not be a proximate cause of the harm. *Kendall v. Gore Properties,* 236 F.2d 673 (D.C.Cir.1956); *Ponticas v. K.M.S. Investments,* 331 N.W.2d 907, 912–13 (Minn. 1983); *Stevens v. Lankard,* 31 A.D.2d 602, 297 N.Y.S.2d 686 (1968), *aff'd,* 25 N.Y.2d 640, 306 N.Y.S.2d 257, 254 N.E.2d 339 (1969); *Stone v. Hurst Lumber Co.,* 15 Utah 2d 49, 386 P.2d 910 (1963).

Second, if a negligent hiring is shown, the plaintiff still must prove that the hiring was a proximate cause of the injury. *Scott v. Watson, supra,* 278 Md. at 171, 359 A.2d 548; *Peterson v. Underwood,* 258 Md. 9, 16–17, 264 A.2d 851 (1970). Again, by way of example, if Slater had been negligently hired but had assaulted a tenant of the HOC previously unknown to him, in a nearby shopping center and during off-duty hours, there would be no causal relationship between the hiring and the assault.

In attempting to prove the first link in this chain of causation, Appellant properly sought to prove the probable consequences of a reasonable inquiry. She produced the three individuals listed by Slater on his employment application as persons "who can comment on your education

and/or work experience." Each testified to the absence of any contact by the HOC, and further testified to a lack of any knowledge of Slater's educational background or work experience. Appellant proved that one of the previous employers named on the application, but not contacted, had knowledge of Slater's imprisonment. She offered evidence that the only other previous employer listed by Slater probably could not have been located because of the failure to include a proper address or any telephone number on the application.

Appellant then offered to prove that Slater's criminal and arrest record was available to the HOC by a telephone call to the records section of the Montgomery County Police Department, or by requiring that Slater obtain and present a copy of his criminal record. Further, Appellant proffered that a record check made at the time of hiring would have disclosed Slater's convictions in Montgomery County, as well as the fact that he was awaiting trial on rape and related charges.[9] The trial judge refused to admit this evidence, stating:

> No, Sir, because they were not required to look at the criminal record, and the jury is not going to get into the concern as to whether—how easy, how they could have gone about getting them; and I still hold as a matter of law under the circumstances that you have presented, there is no requirement for them to run a record check.

---

**9.** Appellant also offered the expert testimony of Michael Hull, director of residential operations for a large rental management corporation in the Washington Metropolitan area. He testified that in 1975 the Montgomery County and District of Columbia Police Departments provided information of criminal convictions to prospective employers in response to telephone inquiries, and that it was the standard practice of the personnel departments of real estate management companies in 1975 to make such inquiries before hiring anyone who would have access to tenant's units or keys. Although the testimony was originally received as substantive evidence in Appellant's case, the trial judge later instructed the jury that it could be considered only for the limited purpose of showing the experience of the expert witness.

This ruling was in error, and requires reversal. Because Appellant had the burden of showing that Slater was unfit for the position of housing inspector, and that a reasonable inquiry would have produced information bearing on that issue, she was entitled to place before the jury evidence of an additional area of investigation open to the HOC, the relative ease with which it could have been conducted,[10] and the information that would have been obtained had the inquiry been made.[11] One can normally assume that anoth-

---

**10.** Federal and state statutes and regulations enacted since 1975 have limited to some extent the availability of criminal record information. *See,* Criminal Justice Information System, 28 C.F.R. § 20.1 *et seq.* (1985); Maryland Code (1957, 1982 Repl.Vol., 1984 Cum.Supp.) Article 27, § 743 *et seq.* (State Criminal Justice Information System); COMAR 12.06.08.10 *et seq.* Private employers (except banks) generally cannot obtain federal criminal history information. At the state level, private employers ordinarily cannot obtain criminal history *arrest* information, but can obtain criminal history *conviction* information upon petition to the Secretary of Public Safety and Correctional Services showing a particularized need. COMAR 12.06.08.10D(1) prohibits dissemination of criminal history conviction information to a private employer unless

> the employer demonstrates to the Secretary that the activities or duties of the prospective employee or employee for whom the conviction [criminal history record information] is requested would bring the prospective employee or employee into such close and sensitive contact with the public that the use of the information in hiring, transfer, or promotion of the employee would serve to protect the safety or be in the best interests of the general public or bring the prospective employee or employee into such close and sensitive contact with the employer's enterprise as to endanger the goodwill or fiscal well-being of the enterprise.

Under current practice a private employer may by petition secure the approval of the Secretary to obtain access to criminal history record information for classes of employees, and thereafter may obtain such information concerning employees or prospective employees in approved classifications, without the necessity of submitting a petition each time a request is made. Conviction and non-conviction criminal history record information is available to the Department of Personnel or other appointing authority of a federal, state or local unit of government for purposes of determining "employment suitability or eligibility for security clearances." COMAR 12.06.08.10F(1).

**11.** Although partial information concerning Slater's criminal record was elicited from Slater during his testimony, the jury could only speculate on whether this information formed a part of the Montgom-

er who offers to perform simple work, not involving danger to others, is competent. Restatement (Second) of Agency § 213, Comment d (1958). On the other hand, where the work involves a serious risk of harm if the employee is unfit, as in the hiring of a police officer, there is no presumption of competence and there may well exist a duty to conduct a criminal record investigation. Other factors must be considered, including the availability of such information; the cost, inconvenience, and delay in obtaining it; whether other sources, including a previous employment record in the same field, are sufficient to justify a finding of fitness; and whether unanswered questions, negative indicators, or other "red flags" have surfaced during routine investigation. No single factor is dispositive, and the trier of fact must consider all of the circumstances to determine whether the failure to obtain a criminal history record constitutes a breach of duty in a given case.

Clearly there exists a tension between competing interests. On the one hand, there is the individual's right of privacy, the desire of the previously convicted individual to secure employment in any area for which the person is suited, and the societal interest in rehabilitation of offenders. On the other hand, there is a significant need to protect society from the enhanced risk of careless employment practices. In the first instance that balance is struck by the Congress, the General Assembly, and the agencies charged with the collection and dissemination of criminal history record information, through the enactment of laws and regulations specifying the circumstances under which the information should be provided to employers. That policy decision has been made, and where it has been determined that the balancing of interests does not warrant dissemination of the information, the employer cannot be faulted for not having obtained it. Where, however, the decision has been made to provide the information, it be-

---

ery County criminal records in 1975, and whether and with what facility it could have been obtained by the HOC.

comes a jury question as to whether an employer is negligent in not seeking it.

■ The HOC contends that any error in the exclusion of this evidence must be considered harmless because the evidence was relevant only to the issue of causation. The jury's finding that the HOC had not been negligent in hiring Slater removed from consideration the issue of causation. We disagree, for two reasons. First, evidence of the ready availability of criminal record information was relevant to the initial consideration of negligence. To determine whether the HOC was negligent, the jury was required to consider whether the HOC's acts of omission or commission were those of a reasonably prudent employer *under the circumstances*. Among the many circumstances to be considered by the jury in a case of this kind are the various types of inquiries that could have been made, and the ease or difficulty of obtaining helpful information through those sources. A jury without knowledge of whether an employer could obtain criminal record information, or how difficult or expensive it might be to do so, would be hard pressed to find that the failure to seek such information constituted a breach of duty.

Second, we conclude the jury's finding was not limited to a consideration of issues of duty and breach, but embraced the first link in the chain of causation as well. Because the excluded evidence was directly relevant to the issue of causation, the exclusion of the evidence was prejudicial. The three interrogatories submitted to the jury were as follows:

1. Do you find that Housing Opportunities Commission was negligent in hiring Mr. Slater? Yes___ No___

2. If your answer to question No. 1 was "yes", do you find that that negligence was a proximate cause of the assault on the Plaintiff? Yes___ No___

3. In what amount do you assess compensatory damages? $_____

As we have previously noted, an employer may be guilty of negligence without incurring liability for the harm claimed, if either of the two links necessary to establish a chain of causation in this case is not proven. An employer who hires an armed security guard without being possessed of any information concerning his fitness, and without conducting any investigation, is negligent. However, if it is a fact that the guard has an unblemished record and excellent reputation for trustworthiness, and that no potentially disqualifying information would have been obtained through the conduct of an appropriate inquiry, the employer has not been guilty of a *negligent hiring.* Rather than asking the jury whether Appellant had shown that the HOC breached any duty owed to her (which would have framed the issue of negligence), the first interrogatory went further and asked whether Appellant had shown that the HOC was "negligent in hiring Mr. Slater?" This question embraced the concept of the first link in the chain of causation as well as those of duty and breach.

Admittedly this is a fine distinction, but that distinction was not lost on the jury. During deliberations, the jury sent the following note to Judge Cave:

In answering question #1, "Do you find that HOC was negligent in hiring Mr. Slater?", must the jury decide that if HOC had made a proper inquiry, it should have or would have discovered the dangerous propensity or tendency of Mr. Slater at that time (1975–76)?

In other words, are there two parts to the negligence question:

(1) Was HOC negligent in failing in its duty to make reasonable inquiry; and

(2) If the employer (HOC) has the duty to make reasonable inquiry, must Plaintiff show by a preponderance of evidence, that if reasonable inquiry had been made by HOC (1975–1976) HOC would have discovered the dangerous tendency of Mr. Slater (and therefore not hired him)?

The judge, after consultation with counsel, instructed the jury in writing that "[p]laintiff has the burden by a prepon-

derance to prove what a reasonable inquiry would have discovered." Earlier notes sent by the jury confirm their understanding of the issues involved, and indeed reflect their concern with the absence of the very type of evidence excluded in this case. We reproduce the notes, and the written answers given by the trial judge:

> Issue: Would reasonable inquiry (which they did not do) on part of HOC [have] revealed Slater as a dangerous person.
>
> Do we decide this on basis of evidence presented, or do we decide on basis of our own assumptions, beyond the evidence.

The judge responded:

> Ladies & Gentlemen,
>
> You must base your verdict on the evidence presented in the trial—you may not speculate—you use your common sense in weighing the evidence that has been presented.

The jury also inquired:

> Explain to the jury what the plaintiff's burden of proof is with respect to demonstrating that if a reasonable inquiry into Slater's background had been made pursuant to his application, the HOC should have or would have [discovered?] his violent propensities.
>
> Our problem is that we are having trouble agreeing on the degree to which we are being asked to speculate on what "would have happened" as a result of a reasonable inquiry into Slater's past.

Although we need not consider this fact in determining the issue, we note that in delivering its verdict the jury specifically requested the opportunity to explain its answer to the first interrogatory, and did so by the following written statement: [12]

---

12. Apparently when the foreman advised the bailiff the jury had reached a verdict, he also stated that the jury wished to explain its answer. The request to explain a "yes" or "no" answer is one commonly made by witnesses, but rarely by jurors. In this instance the request was granted by the trial judge, and the note was first read by

The jury feels strongly that the Housing Opportunity Commission acted carelessly and irresponsibly in failing to make the most basic inquiries into the background and trustworthiness of George Slater, before hiring him for a position of trust, a position which gave him access to tenants' property and persons.

However, the jury *did not* find that the Plaintiff's counsel had presented *a preponderance of evidence* to show that a reasonable inquiry by HOC into George Slater's background would have *more probably than not* revealed that Slater had a viscious (sic) propensity which posed a threat to members of the public with whom his job brought him in contact. (Emphasis in original.)

We next consider Appellant's contention that the trial judge erred in directing a verdict against her on the issue of causation. As we have noted, there are two distinct parts to the chain of causation that must be established in this case. With respect to the first of these, the nexus between the negligence of the HOC and the hiring of Slater, we conclude that had the evidence improperly excluded been admitted there would have been sufficient evidence for the jury to find a causal relationship, and thus a negligent hiring. The more difficult question involves the causal relationship between the hiring of Slater and the subsequent assault. Appellant contends that Slater's employment provided him with access to her home, so that he was familiar with the layout of the interior, and that he would have learned from his inspection that the kitchen window was accessible from the outside. We note that the kitchen window was located on the end wall of Appellant's end unit, so that its location was readily observable by the general public. The jury could have found that knowledge of the interior layout of the townhouse was helpful to Slater in the commission of the crimes, but of even greater significance

the foreman after delivery of the written answers to interrogatories, and was then filed by direction of the judge. No objection was lodged to this procedure.

was the fact that Slater had used his position to obtain the knowledge that Appellant and her three year old twins were the sole occupants of the home.

◼ A jury could find this to be important information to a person contemplating burglary or rape, and could find that Slater was able to obtain the information only because the position he held inspired Appellant to have confidence in him, and led her to the belief that it would be safe to impart that information to him. We conclude the evidence, at least when supplemented by that which should not have been excluded, was sufficient to permit the trier of fact to find that the element of causation had been established. It was therefore error to direct the entry of a verdict in favor of the HOC.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED: CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND FOR A NEW TRIAL; COSTS TO BE PAID BY APPELLEE.