17 A.3d 155

**Carla A. LATTY, et al.**

v.

**ST. JOSEPH'S SOCIETY OF the SACRED HEART, INC.**

**No. 2487, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

April 4, 2011.

256

258

John J. Condliffe, Towson, MD & L. Palmer Foret, Washington D.C. (Carmen L. Durso, Boston, MA, on the brief), for appellant.

Steven G. Metzger & Brian T. Tucker (Thomas C. Dame, Gallagher, Evelius & Jones, LLP, on the brief), Baltimore, MD, for appellee.

Panel: ZARNOCH, GRAEFF and ALAN M. WILNER (Retired, Specially Assigned), JJ.

ZARNOCH, J.

This case arises out of an affair between a Josephite priest and a church organist which allegedly occurred over fifty years ago. The priest, Father Francis E. Ryan ("Fr. Ryan"),

allegedly fathered two children, appellants, Carla A. Latty and Adrian Senna. According to appellants, the Josephite Fathers and the priest covered up the affair and concealed the identity of their father. Appellants are now in their late fifties (Latty) and sixties (Senna), and claim that they recently learned through DNA testing that the priest, Fr. Ryan, now deceased, was "most probably" their father.

In April of 2009, appellants brought suit in the Circuit Court for Baltimore City against the St. Joseph's Society of the Sacred Heart, Inc. ("the Josephite Fathers" or "the society") [1] of which Fr. Ryan was a member, the Archdiocese of Baltimore, the Archbishop of Baltimore, and Fr. Ryan's estate, alleging fraudulent concealment, intentional infliction of emotional distress, negligent hiring, negligent supervision and retention, and breach of fiduciary duty.[2] They said that the Josephite Fathers had a legal duty to disclose the identity of their father, that the failure to disclose this information led to great emotional distress, and that the society should be held liable for failing to put an end to the affair. The Archdiocese and the Archbishop were dismissed from the case and Fr. Ryan's estate was never served. The Josephite Fathers moved to dismiss the claims, and the circuit court granted the motion. Appellants timely filed this appeal, and present the

---

**1.** Because we are reviewing circuit court action on a motion to dismiss and the issue is not pressed here, we need not definitively resolve the proper characterization of the Josephite Fathers for Catholic hierarchy purposes or consider the vow requirements associated with each category. Catholic authorities recognize a dichotomy between Institutions of Consecrated Life, which include religious orders, and Societies of Apostolic Life. *See* The Canon Law Society of America, *The Code of Canon Law: A Text and Commentary* (1985) at pp. 453–542. At least some members of religious orders take solemn vows, either permanent or temporary; members of other religious institutions may take simple vows; and members of societies of apostolic life may take no vows at all. *Id.* We do note that according to *Annuario Pontificio* (2003) at 1375, the Society of St. Joseph's of the Sacred Heart is a Society of Apostolic Life.

**2.** Appellants also alleged professional negligence and fiduciary fraud, but do not appeal the dismissal of these counts.

following question for our review: [3]

Did the circuit court err in dismissing all of appellants' claims?

For the reasons that follow, we affirm the circuit court's dismissal of all of the claims.

## FACTS AND LEGAL PROCEEDINGS

In the late 1940s and early 1950s, Anna Maria Franklin Senna was an organist for a Roman Catholic church where Fr. Ryan was a priest.[4] Fr. Ryan and Senna met and became romantically involved. Subsequently, Anna Senna gave birth to two children: Carla A. Latty, in 1952, and Adrian Senna, apparently in the 1940s.[5] Anna Senna gave Carla up for adoption in 1952, but raised Adrian herself. Appellants Carla and Adrian were never told the identity of their biological father.

---

3. We have combined appellants' questions presented. As phrased in appellants' brief, they are:
 1. Did the Circuit Court err in dismissing Count I of Appellants' Complaint, Concealment?
 2. Did the Circuit Court err in dismissing Count II of Appellants' Complaint, Intentional Infliction of Emotional Distress?
 3. Did the Circuit Court err in dismissing Count III of Appellants' Complaint, Negligent Hiring?
 4. Did the Circuit Court err in dismissing Count IV of Appellants' Complaint, Negligent Supervision & Retention?
 5. Did the Circuit Court err in dismissing Count VII of Appellants' Complaint, Breach of Fiduciary Duty?

4. At the hearing on the motion to dismiss, appellants' attorney stated that Anna Senna was "an organist in the church in another state, but [she] and Father Ryan met because [she] was a member of a congregation of a church in which Father Ryan was a priest." The complaint states that the pair met when Anna Senna was "playing the organ for a church where [Fr.] Ryan was assigned." For the purposes of this opinion, we will assume the latter is correct because it was stated in both the complaint and briefs.

5. Neither the complaint, nor appellants' brief states Adrian Senna's birthday. At the hearing, appellants' attorney stated he was "in his sixties." Although the dates of various events surfaced in legal argument, the complaint itself is noticeably barren of details regarding dates and locations of the facts alleged. It would appear that the events alleged did not occur in this State.

Anna Senna and Fr. Ryan have both since passed away. Carla currently resides in New Jersey, and Adrian resides in British Columbia, Canada. In their complaint, they asserted that DNA testing revealed that they are biological siblings and that their father was "most probably" Fr. Ryan.

On April 1, 2009, Carla and Adrian filed suit in the Circuit Court for Baltimore City against the Josephite Fathers. They alleged that the society knew about Fr. Ryan's breach of a vow of celibacy and the birth of the children and asserted that the society worked to cover up the affair and conceal the fact that Fr. Ryan was their father. The complaint did not allege that Anna Senna disclosed these facts to appellants. They also asserted that the Josephites forced Anna Senna to give Carla up for adoption, forced her to conceal the identity of appellants' biological father, and never provided any financial support to the children. Appellants, in their brief, allege the society was "the sole keeper of Fr. Ryan's finances and income." They requested $5 million in compensatory damages, in addition to $5 million in punitive damages, and costs.

The society moved to dismiss the complaint on numerous grounds. On November 23, 2009, the circuit court heard arguments on the motion to dismiss. That same day, in a brief order, Judge M. Brooke Murdoch granted the motion and dismissed appellants' complaint with prejudice.

## DISCUSSION

### I. Standard of Review—Motion to Dismiss

Appellants argue that the court erred in dismissing their complaint, specifically their allegations of: fraudulent concealment; intentional infliction of emotional distress; negligent hiring, negligent supervision and retention; and breach of fiduciary duty. A trial court may grant a motion to dismiss if, when assuming the truth of all well-pled facts and allegations in the complaint and any inferences that may be drawn, and viewing those facts in the light most favorable to the non-moving party, "the allegations do not state a cause of action for which relief may be granted." *RRC Northeast, LLC v.*

*BAA Md., Inc.*, 413 Md. 638, 643, 994 A.2d 430 (2010). However, the facts set forth in the complaint must be "pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice." *Id.* at 644, 994 A.2d 430. On appeal, we review a trial court's decision to grant a motion to dismiss for legal correctness. *Id.*

## II. First Amendment

■ Cases such as this, which we believe raise issues of religious interpretation, necessarily implicate the First Amendment. The First Amendment provides, through its Free Exercise and Freedom of Religion clauses, that civil courts cannot "entangle[themselves] in questions of religious doctrine, polity, and practice." *From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church, Mid–Atl. II Episcopal Dist.*, 370 Md. 152, 179, 803 A.2d 548 (2002). In explaining why Maryland does not recognize the tort of clergy malpractice, this Court stated:

> [R]ecogniz[ing] the tort of clergy malpractice . . . requires . . . embroil[ing] courts in establishing the training, skill, and standards applicable for members of the clergy in a variety of religions with widely varying beliefs . . . [and] would require courts to identify the beliefs and practices of the relevant religion and then to determine whether the clergyman had acted in accordance with them. These requirements, quite obviously, have a large potential to restrain the free exercise of religion[.]

*Borchers v. Hrychuk*, 126 Md.App. 10, 23–24, 727 A.2d 388, (1999) (internal citations and quotations omitted). Thus, we cannot determine whether Fr. Ryan breached an alleged vow of celibacy (or any other vow) or whether the Church is liable for enforcement of the vow.[6]

Appellee asks us, right off the bat, to dispose of appellants' case as barred by the First Amendment. Because this case

---

**6.** We note that under the *Code of Canon Law,* a vow obligates only the person who makes it. Canon 1193.

may be disposed of on other grounds, we will adhere to the "established policy to decide constitutional issues only when necessary," and avoid any First Amendment issues as they relate to appellants' claims. *VNA Hospice v. Dep't of Health & Mental Hygiene*, 406 Md. 584, 604, 961 A.2d 557 (2008). As such, in our discussion below, we will attempt, if possible, to treat the society as though it were a secular employer in determining the legal merits of appellants' case.

### III. The Josephite Fathers Had No Legal Duty to Appellants

█ In order to survive a motion to dismiss, appellants' claims of fraudulent concealment and breach of fiduciary duty require the existence of an underlying duty that the society owed to them. *See Blondell v. Littlepage*, 413 Md. 96, 119, 991 A.2d 80 (2010) ("[T]he essential elements of a claim of fraudulent concealment include . . . the defendant owed a duty to the plaintiff to disclose a material fact[.]"); *Kann v. Kann*, 344 Md. 689, 713 (1997) (holding that a cause of action for breach of fiduciary duty requires that the plaintiff "identify the particular fiduciary relationship involved"). Appellants assert that a special relationship existed between them and the Josephite Fathers, giving rise to a duty, because they are the children of one of its priests. The Court of Appeals has explained that a duty exists when there is:

> . . . [a]n obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. In essence, the determination of whether an actionable duty exists represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant.

*Blondell*, 413 Md. at 120, 991 A.2d 80 (internal citations omitted). Because we find that the society owed no legal duty to appellants arising out of a special relationship, we affirm the circuit court's dismissal of appellants' breach of fiduciary duty and fraudulent concealment claims.

## A. Special Relationship

Appellants argue that a special relationship existed based on either a confidential or fiduciary relationship. First, they assert that a confidential relationship arose because Fr. Ryan, a priest, exercised "dominion and influence" over appellants, who they argue must have been considered parishioners since birth. *See Midler v. Shapiro*, 33 Md.App. 264, 268, 364 A.2d 99 (1976). Second, appellants assert there was a fiduciary relationship because there was "actual reposing of confidence," *see Thiede v. Startzman*, 113 Md. 278, 77 A. 666, (1910), and "one party trust[ed] in and relie[d] on another," *see Anderson v. Watson*, 141 Md. 217, 234, 118 A. 569 (1922).

■ Generally, "there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person or between the actor and the person injured." *Remsburg v. Montgomery*, 376 Md. 568, 583, 831 A.2d 18 (2003). Special relationships can be established: "(1) by statute or rule; (2) by contractual or other private relationship; or (3) indirectly or impliedly by virtue of the relationship between the tortfeasor and a third party." *Id.* at 583–84, 831 A.2d 18. Under the first prong, there is no rule or statute in Maryland establishing a legal relationship between an employer and an employee's children, or between a priest and his parishioners. Second, the complaint does not allege that there was any contract between appellants and Fr. Ryan or the society.

■ Under the third prong, a special relationship between two parties may be "established by either the (1) inherent nature of the relationship between the parties; or (2) by one party undertaking to protect or assist the other party, and thus often inducing reliance upon the conduct of the acting party." *Id.* at 589–590, 831 A.2d 18. Appellants ask us to find their relationship with the Josephite Fathers and Fr. Ryan was a special relationship under the third prong. For the reasons that follow, we decline to find that the relationship between appellants and appellees constituted any kind of legal

relationship, confidential or fiduciary, and did not bestow a duty on appellee.

### 1. Confidential Relationship

While some confidential relationships arise if there is a familial relationship, "the mere existence of a familial relationship is not indicative of a confidential relationship." *Orwick v. Moldawer*, 150 Md.App. 528, 538–39, 822 A.2d 506 (2003). There may also be a confidential relationship between a priest and penitent. *Buxton v. Buxton*, 363 Md. 634, 654–655, 770 A.2d 152 (2001). However, neither a familial or priest-parishioner relationship automatically constitutes a confidential one. Some relationships, like those between an attorney-client or trustee-beneficiary, presume a confidential relationship as a matter of law. *See Upman v. Clarke*, 359 Md. 32, 42, 753 A.2d 4 (2000). This is not true for a parent-child or priest-parishioner/penitent relationship. Whether a confidential relationship exists for a parent-child or a priest-parishioner is "an issue of fact and is not presumed as a matter of law." *Sanders v. Sanders*, 261 Md. 268, 276, 274 A.2d 383 (1971). *See also Buxton v. Buxton*, 363 Md. 634, 655, 770 A.2d 152 (2001) (stating that a confidential relationship "is particularly likely to exist where there is a family relationship or . . . between physician and patient or priest and penitent" but such a relationship does not "involve[ ] . . . certain consequences as to transactions between the parties that flow automatically as a matter of law from the relation"). To make that factual determination of whether a confidential relationship exists when it is not presumed as a matter of law, we look for a dependent relationship where one party must "necessarily repose trust and confidence in the good faith and integrity of the other." *Orwick*, 150 Md.App. at 536, 822 A.2d 506. The key is "whether a level of trust and confidence exists between two people." *Id.* at 538–39, 822 A.2d 506.

There is no hint in the complaint that a confidential relationship existed between Fr. Ryan, the society and appellants. In fact, there was no allegation of any relationship between them at all. Even if we assume that appellants were automatically

parishioners of Fr. Ryan's church from birth, this still does not establish a confidential relationship.[7]

There are several examples in the caselaw illustrating what constitutes a confidential relationship if one is not presumed. A familial relationship can be a confidential one where one family member acts as the care giver for a relative. For example, in *Upman v. Clarke*, Ms. Upman, an elderly woman, moved in with her nephew and his wife when she could no longer care for herself. 359 Md. 32, 40, 753 A.2d 4 (2000). Ms. Clarke helped Ms. Upman with most of her daily activities, including: "dressing, eating, bathing, even going to the bathroom." *Id.* The Clarkes also took care of her finances. *Id.* There was very clearly a dependent relationship between Ms. Upman and the Clarkes.

■ A priest-parishioner relationship can also be a confidential one under certain circumstances. For a priest and a parishioner to have a confidential relationship, there must be *actual* trust and confidence between the parties. It is not enough for the parties to have *theoretical* or *assumed* trust and confidence, merely by virtue of one party being a member of a church and the other party its spiritual leader. To illustrate, in *Sellers v. Qualls*, a pastor had a confidential relationship with a church member because the pastor handled most of the church member's business affairs, including conducting business for her at her bank and assisting her with the sale of some property. 206 Md. 58, 69–71, 110 A.2d 73. He also occasionally took her to see the doctor. *Id.* at 69, 110 A.2d 73. Again, there was clearly a dependent relationship in addition to the pastor's role as spiritual leader of the church.

The relationships in *Upman* and *Sellers* are a far cry from the allegations in the complaint here. We cannot infer from

---

7. An obvious tension exists between appellants' theory that the society had a duty to disclose that Fr. Ryan was their father and their contention that they were parishioners at birth. It would have been quite difficult for the society to communicate this fact to them at that particular time. The complaint is noticeably silent as to when disclosure should have occurred.

the complaint that Fr. Ryan or the society handled appellants' day to day care or assisted with their financial affairs. There was simply no contact between the parties that would suggest appellants depended on the Josephite Fathers at all. Appellants appear to believe that because they *should* have been able to depend on the society or Fr. Ryan for financial and emotional support, and that this is sufficient to constitute a confidential relationship. But Maryland caselaw offers no support for this theory.

## 2. Fiduciary Relationship

There is also no fiduciary relationship between the parties. A fiduciary relationship is presumed to exist as a matter of law in specific situations: between a "trustee and beneficiary, guardian and ward, agent and principal, attorney and client, partners in a partnership, [or] corporate directors and their corporation[.]" *Buxton v. Buxton*, 363 Md. 634, 654, 770 A.2d 152 (2001). A fiduciary duty may also arise by agreement. *Lasater v. Guttmann*, 194 Md.App. 431, 456 (2010) (in Maryland, a husband and wife do not, as a matter of law, have a fiduciary relationship unless they have an agreement that establishes one). Such a relationship "involves a duty on the part of the fiduciary to act for the benefit of the other party to the relation as to matters within the scope of the relation." *Id.*

There was no agreement here between the parties from which a fiduciary duty would arise. Nor does the parties' relationship give rise to a duty presumed as a matter of law: the parties did not have an attorney-client, trustee-beneficiary, principal-agent, attorney-client, or partnership relationship, nor were they directors of a corporation. Even if a guardian-ward relationship were alleged, this would not aid appellants' claim because a guardian must be appointed by the court, and it is clear that no guardian was appointed here. *See* Md.Code (1974, 2001 Repl. Vol.) Estates and Trusts Article (ET), § 13-201. Thus, the Josephite Fathers did not have a fiduciary duty to appellants.

## B. Financial Dependence on the Society Does Not Create Duty

Appellants also argue that the society had a duty to them "as the sole keeper of Fr. Ryan's finances and income, to inform Appellants of Fr. Ryan's paternity, and to take care of his financial support and obligations." [8] This argument suggests that because the society was solely responsible for his finances, the society should have acted as a parent to appellants, becoming financially responsible for Fr. Ryan's children. As we discussed above, the First Amendment requires us to take the religious context out of our analysis, and to consider the Josephite Fathers and Fr. Ryan's relationship as one of employer-employee. Given this relationship, there is simply no statute, tort, or caselaw in Maryland making an employer liable for financial support of an employee's children, even if the salary paid by the employer was the employee's only source of income.

The only legal construct in Maryland we can conceive that approaches appellants' theory is a guardian-ward relationship between the society and Fr. Ryan. *See* ET § 13-201. If Fr. Ryan was considered "disabled," or "unable to manage his property and affairs," it is arguable that the society, as the "sole keeper of Fr. Ryan's finances and income," would, in effect, have become Fr. Ryan's guardian. *See id.* As guardian, the society would then be responsible for managing Fr. Ryan's financial affairs, including any viable child support obligations. *See* ET § 13-216 ("If the exercise of a power is

---

**8.** The appellants do not specifically allege that Fr. Ryan took a vow of poverty. Generally, a vow of poverty is defined as:

> ... the promise made to God of a certain constant renunciation of temporal goods, in order to follow Christ. The object of the vow of poverty is anything visible, material, appreciable at a money value.... The vow of poverty entirely forbids the independent use, and sometimes the acquisition or possession of such property as falls within its scope. A person who has made this vow gives up the right to acquire, possess, use, or dispose of property except in accordance with the will of his superior.

William Brian Mason, 33 Brook. J. Int'l L. 655, 683 n. 197 (2008). However, they do assert that the society was solely responsible for his finances and income.

improper, the guardian is liable for breach of his fiduciary duty to ... interested persons for resulting damage or loss[.]"). However, this scenario is far-fetched, filled with logical missteps, and is only our attempt to ground appellants' alleged duty in actual legal principles.

Even if we were to presume that third party paternity liability existed, appellants' argument would still fail because of the significant delay in bringing their claims. In Maryland, in the case of a child born to unmarried parents, paternity must be established in order to obligate the father to financially support the child. *See* Md.Code (1984, Repl.Vol.2006), Family Law Article (FL), § 5–1001 *et. seq.* If the father does not acknowledge paternity,[9] there must be a judicial determination that he is the father in an action brought in a circuit court. FL § 5–1032(a). Such a paternity proceeding must be brought before the child's 18th birthday. FL § 5–1006(a)[10]; *Trembow v. Schonfeld,* 393 Md. 327, 329, 901 A.2d 825 (2006). As appellants are now in their fifties and sixties, any possible paternity action has expired long ago. We acknowledge that appellants are not asserting a claim for child support against the Josephite Fathers, but in an attempt to assert a duty where none exists, appellants have argued that the society should be liable for Fr. Ryan's financial obligations to his children. However, once appellants became emancipated adults, Fr. Ryan was forever freed of any legal obligation to financially support them. The same is true of any theoretical liability of his employer, the society.[11]

---

**9.** The complaint concedes that Fr. Ryan never acknowledged paternity, alleges only that he was "most probably" the father, and does not allege that Anna Senna admitted his paternity.

**10.** During the relevant time frames in this case, the paternity suit would have had to have been brought before the children turned twenty-one. *See* Md.Code (1957, 1966 Repl.Vol.), Art. 16, § 66H. Even if this more generous limitations period were applicable, a child support claim would still be untimely.

**11.** Aside from an extinguished child support claim, it is not clear what other monetary damages the children could recover on the basis of not

## IV. Breach of Fiduciary Duty

 Because the society had no fiduciary duty to appellants, there can be no cause of action for its breach. This is true for another reason. Maryland courts generally do not recognize breach of fiduciary duty as a stand alone tort. *Kann v. Kann,* 344 Md. 689, 713, 690 A.2d 509 (1997) ("[T]here is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries."); *International Brotherhood of Teamsters v. Corroon,* 369 Md. 724, 727 n. 1, 802 A.2d 1050 (2002) ("Maryland does not recognize a separate tort action for breach of fiduciary duty."). A distinction may exist between an action seeking equitable relief, which may give rise to "a separate cause of action for breach of fiduciary duty," and a claim for monetary damages at law, which does not constitute a separate cause of action. *Wasserman v. Kay,* 197 Md.App. 586, 631, 14 A.3d 1193 (2011). When monetary damages are sought, a claim or cause of action for breach of a fiduciary duty may be available, but only if the breach gives rise to another cause of action. *Kann,* 344 Md. at 713, 690 A.2d 509 ("This does not mean that there is no claim or cause of action available for breach of fiduciary duty. Our holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion."); *Teamsters,* 369 Md. at 727 n. 1, 802 A.2d 1050 (stating that "the breach of a fiduciary duty may give rise to one or more causes of action"). Because appellants are seeking monetary damages here, and have not successfully asserted that the society's breach gives rise to another well-pled cause of action, the claim was properly dismissed by the trial court.

## V. Fraudulent Concealment

 In support of the fraudulent concealment claim, appellants argue that the Josephite Fathers had a duty to disclose to appellants Fr. Ryan's possible parenthood. A duty to disclose is typically predicated on a confidential or fiduciary

---

knowing that their father was a priest who breached a vow of celibacy to have an affair with their mother.

relationship between two parties. *Hogan v. Md. State Dental Ass'n,* 155 Md.App. 556, 566, 843 A.2d 902 (2004). Absent an agreement or obligation to disclose, or a special relationship, non-disclosure cannot constitute fraud. *Id.* As we have discussed, there was no confidential or fiduciary relationship between either the society and appellants or Fr. Ryan and appellants. Appellants assert that the Josephite Fathers owed a "separate and independent duty" to them to disclose their parentage, but cite no caselaw, nor can we find any, in support of this assertion. Appellants are requesting that we establish a new duty where none currently exists. We decline to do so.

## VI. Negligent Hiring, Supervision, and Retention

Next, appellants argue that the society is liable for negligently hiring, supervising, and retaining Fr. Ryan because the society "knew or should have known that Fr. Ryan used his position in the church to engage in sexual relations with Ms. Senna ... [which] resulted in the birth of Appellants." While the society "is obligated to the public to use due care in selecting and retaining only competent and careful employees," we do not think under these facts that appellants have sufficiently pled a cause of action for negligent hiring, retention, or supervision. *State v. Jones,* 197 Md.App. 638, 669, 14 A.3d 1223 (2011). To survive a motion to dismiss the negligent hiring, retention and supervision claim, appellants must establish the following five elements:

(1) the existence of an employment relationship;

(2) the employee's incompetence;

(3) the employer's actual or constructive knowledge of such incompetence;

(4) the employee's act or omission causing the plaintiff's injuries; and

(5) the employer's negligence in hiring[, supervising] or retaining the employee as the proximate cause of plaintiff's injuries.

*State v. Jones, supra,* (internal citations and quotations omitted). *See also Cramer v. Housing Opportunities Com.,* 304

Md. 705, 711, 501 A.2d 35 (1985) ("Where an employee is expected to come into contact with the public ... the employer must make some reasonable inquiry before hiring or retaining the employee to ascertain his fitness, or the employer must otherwise have some basis for believing that he can rely on the employee.").

Appellants point to the fourth element, arguing that negligent hiring, supervision and retention claims can be brought against a religious institution for the act of an employee, including a priest, committing sexual misconduct against a minor. *See Doe v. Archdiocese*, 114 Md.App. 169, 172–174, 190, 689 A.2d 634 (1997) (affirming dismissal of negligent hiring, placement, and supervision claims, among others, as time barred where altar boy was sexually abused by two priests as a child but did not bring claims until 17 years after he reached the age of majority). However, there is simply no evidence here of *criminal* misconduct. Aside from a conclusory allegation that Fr. Ryan took advantage of Anna Senna, appellants' complaint fails to show that the couple had anything more than an adult, consensual relationship.

Appellants assert that Fr. Ryan's breach of an alleged vow of celibacy was sufficient misconduct to provide a basis for the society's negligence. To explore this argument would ensnare us in the First Amendment's Free Exercise and Freedom of Religion clauses. As we have discussed above, we are precluded from doing so.

Even if we take the breach of the vow of celibacy out of the equation and assume, as appellants argue, that Fr. Ryan took advantage of his position of power over Anna Senna when he had an affair with her, it would still be insufficient to constitute a negligence claim against the society. Maryland courts have said that under certain circumstances, a sexual relationship between two adults, where one party takes advantage of his or her power over the other, may constitute extreme and outrageous conduct in the context of an intentional infliction of emotional distress claim. *Borchers v. Hrychuk*, 126 Md.App. 10, 19–20, 727 A.2d 388 (1999); *Figueiredo–Torres v. Nickel*,

321 Md. 642, 655, 584 A.2d 69 (1991) ("Coming from a stranger, or even a friend, this conduct may not be outrageous; but we are not prepared to state as a matter of law that such behavior by a psychologist which takes advantage of the patient's known emotional problems is not extreme and outrageous conduct sufficient to support an intentional infliction of emotional distress claim."); *Homer v. Long*, 90 Md.App. 1, 12–13, 599 A.2d 1193 (1992). However, these cases make a distinction between "officially sanctioned treatment relationships," such as that between a psychologist or psychiatrist and patient, and a relationship in which one party merely provides emotional and spiritual treatment, such as between a pastor and a member of the church. *Borchers*, 126 Md.App. at 19–20, 727 A.2d 388.

 We think that same distinction is applicable in the context of a negligent hiring, supervision, or retention claim. Unless there is an "officially sanctioned treatment relationship," an employer cannot be held liable for the consequences of an employee's adult, consensual sexual relationship. If we were to hold that the society was negligent in this case, it would have the effect of requiring all employers to become entangled in their employees' relationships and to monitor them.[12]

Further, a claim for negligence predicated on the conduct that appellants allege could only be brought by Anna Senna herself, not by her children. She was the only party potentially injured as a result of Fr. Ryan's allegedly taking advantage of his position of power, and hers as an allegedly vulnerable church organist. Conduct directed at Anna Senna does not automatically give her children a cause of action. *Homer*, 90 Md.App. at 12–13, 599 A.2d 1193 (1992) ("[C]onduct directed at A does not necessarily give B a cause of action."). We are unable to connect the dots of liability from the society's alleged failure to properly hire and supervise Fr. Ryan, and

---

**12.** An employer could face potential liability for disclosing an employee's possible paternity to his alleged children, particularly when the employee denies the allegations.

the affair supposedly resulting from the alleged breach, to the injury appellants allege.

When we boil down appellants' argument, they appear to assert that the Josephite Fathers' negligence ultimately caused them to be born, and that they should be able to collect damages as a result. This smacks of a cause of action for wrongful life. A wrongful life cause of action includes claims "by normal but unwanted children who seek damages either from their parents or from others negligently responsible for their conception or birth." *Kassama v. Magat,* 368 Md. 113, 135, 792 A.2d 1102 (2002). Maryland does not recognize such a cause of action, nor did appellants raise it in their complaint or on appeal. *Id.* at 148, 792 A.2d 1102 (holding that "life is not, and cannot be, an injury"). Thus, the negligence that appellants allege the society committed, as well as any possible resulting damages, presents no cognizable cause of action.

## VII. Intentional Infliction of Emotional Distress

Finally, appellants argue that the society is liable for intentional infliction of emotional distress for two reasons. First, they allege the society is vicariously liable for Fr. Ryan's actions because it knew of the situation between Fr. Ryan and Anna Senna and, as his employer, had a duty to prevent him from committing intentional torts in the scope of his employment. Second, appellants allege in the complaint that the society is directly liable because it knew the identity of appellants' father, and worked "actively and passively" to conceal the information in order to "avoid having to compensate Ms. Senna and her children for [Fr.] Ryan's misconduct." In our view, appellants have not sufficiently pled an emotional distress claim under either theory.

A successful emotional distress claim requires proof of the following: "(1) The conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; (4) the emotional distress must be severe." *Manikhi v. Mass Transit Admin.,* 360 Md.

333, 367, 758 A.2d 95 (2000). Even if we were to assume the Josephite Fathers did in fact intend to conceal the identity of appellants' father, and that this constituted extreme and outrageous conduct, appellants did not sufficiently allege that the emotional distress they suffered was severe.

To meet the fourth requirement, appellants must have "suffered a severely disabling emotional response to [the society's] conduct." *Harris v. Jones,* 281 Md. 560, 570, 380 A.2d 611 (1977). The emotional distress alleged must have been so severe that "no reasonable man could be expected to endure it." *Id.* at 571, 380 A.2d 611. In their complaint, appellants allege the following as their emotional distress claim:

26. [Appellants] further allege that [appellee's] concealment of [appellants'] father's identity was intentional and reckless.

27. [Appellants] further allege that this conduct was extreme and outrageous.

28. [Appellants] further allege that this conduct caused severe emotional distress to the [appellants].

This is merely a recitation of the elements of the intentional tort. In other sections of the complaint, appellants assert that as a result of the society's alleged conduct, they suffered various damages, including: "mental anguish, embarrassment, [and] loss of self-esteem." These allegations simply do not meet the requisite standard for pleading this tort with particularity. *See Manikhi v. Mass Transit Admin.,* 360 Md. 333, 368, 758 A.2d 95 (2000).

Our caselaw reveals that emotional distress claims alleging far worse emotional distress than that alleged here were still insufficient to meet the heavy burden of severity. *Id.* For example, in *Manikhi v. Mass Transit Admin.,* the plaintiff alleged the following facts to support the existence of severe emotional distress: that the misconduct caused her to "seek medical treatment;" that "she suffered fear at work; that the misconduct required her constantly to be alert; and that it forced her to leave [her work site] for another work site,

although she later returned." *Id.* The Court of Appeals held that this "fail[ed] to allege a severely disabling emotional response" sufficient to survive a motion to dismiss. *Id.* at 370, 758 A.2d 95 (internal citations and quotations omitted). The Court cited numerous examples of seemingly severe emotional distress, which were still insufficient, such as findings that a "sixteen year old store employee was falsely imprisoned for four hours, coerced into signing confession that he had stolen money, and maliciously prosecuted, the evidence that he went to a psychologist one time, felt insecure and incapable of trusting others, and suffered weight loss did not suffice to show severe distress," in *Caldor, Inc. v. Bowden,* 330 Md. 632, 642–45, 625 A.2d 959. *Id.* at 369, 625 A.2d 959. Nor was the emotional distress severe where "other employees and a supervisor mimicked, harassed, and shamed [the] plaintiff regarding [a] stuttering defect," including "evidence that he felt humiliated and that his speech impediment was exacerbated," in *Harris,* 281 Md. 560, 572, 380 A.2d 611 (1977). *Id.* Appellants' allegations of emotional injury do not rise to the severity of these cases, which were rejected as invalid claims of severe emotional distress.

Nor does appellants' complaint "state with reasonable certainty the nature, intensity or duration of the alleged emotional injury," as is required. *See Manikhi,* 360 Md. at 370, 758 A.2d 95. Appellants do not describe with sufficient specificity the "mental anguish, embarrassment, [and] loss of self-esteem" that they endured. We do not know if at any point the concealment of their father's identity caused appellants to be "emotionally unable . . . to carry on to some degree with the daily routine of [their] li[ves]." *See Moniodis v. Cook,* 64 Md.App. 1, 15–16, 494 A.2d 212 (1985). Even allegations of "physical pain, emotional suffering and great mental anguish," in *Leese v. Baltimore County* were insufficient for this Court to reverse a dismissal for failure to state a claim for emotional distress. 64 Md.App. 442, 472, 497 A.2d 159 (1985), cert. denied, 305 Md. 106, 501 A.2d 845 (1985), overruled on other grounds by *Harford County v. Town of Bel Air,* 348 Md. 363,

704 A.2d 421 (1998). For these reasons, we affirm the circuit court's dismissal of appellants' emotional distress claim.

Rejecting all of appellants' claims as a matter of law, we agree with the circuit court that their complaint should have been dismissed.

**JUDGMENT OF THE CIRCUIT COURT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

